784 So.2d 46 (2001)
Douglas A. ABADIE, et al.
v.
METROPOLITAN LIFE INSURANCE COMPANY, et al.
Addressing Individual Appeals: Alfred Adams, Lester Badeaux, Leroy Bonamour, William Boudreaux, Oscar Champagne, Roger H. Quave, Alvin Robin.
Nos. 00-CA-344 to 00-CA-856.
Court of Appeal of Louisiana, Fifth Circuit.
March 28, 2001.
Rehearing Denied April 26, 2001.
*56 Robert E. Caraway, III, Plauche, Maselli, Landry & Parkerson, New Orleans, LA, *57 Attorney for Defendants/Appellants, Steven Kennedy, Peter Territo, and American Motorists Insurance Company.
Mary L. Dumestre, Marjorie M. Campbell, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, Attorneys for Defendants/Appellants, Avondale Executive Officers.
Thomas G. Milazzo, James L. Fletcher, Jr., Pamela B. Gautier, LeBlanc, Miranda, Warwick & Milazzo, Metairie, LA, Attorneys for Defendants/Appellants, Asbestos Corporation Limited.
Leon Gary, Jr., William L. Schuette, Jr., Antonio D. Robinson, Avery Lea Griffin, Madeleine Fischer, Jones, Walker, Waechter, Poitevent, Carrere & Denegre L.L.P., Baton Rouge, LA, Attorneys for Defendant/Appellant, CBS Corporation.
John J. Hainkel, III, Angela M. Bowlin, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, Attorneys for Defendant/Appellant, Owens Corning.
J. Burton LeBlanc, IV, Cameron R. Waddell, Brian F. Blackwell, Sandra A. Jelks, Dawn Smith Rodrigue, Steven M. Jupiter, LeBlanc, Maples and Waddell, L.L.C., and Robert E. Arceneaux, Barham & Arceneaux, New Orleans, LA, Attorneys for Plaintiffs/Appellees.
Frank J. Swarr, Mickey P. Landry, Landry & Swarr, L.L.C., New Orleans, LA, Attorneys for Plaintiffs/Appellees, Earlven Gauthe and Johnnie Johnson.
Panel composed of Judges DALEY, EDWARDS, and LOBRANO, Pro Tempore.

 TABLE OF CONTENTS
 PAGE NO.
INTRODUCTION ............................................................. 58
COMMON ISSUE 1 ........................................................... 59
COMMON ISSUE 2 ........................................................... 62
COMMON ISSUE 3 ........................................................... 62
COMMON ISSUE 4 ........................................................... 65
COMMON ISSUE 5 ........................................................... 67
COMMON ISSUE 6 ........................................................... 69
COMMON ISSUE 7 ........................................................... 69
COMMON ISSUE 8 ........................................................... 70
COMMON ISSUE 9 ........................................................... 70
COMMON ISSUE 10 .......................................................... 70
COMMON ISSUE 11 .......................................................... 71
COMMON ISSUE 12 .......................................................... 73
COMMON ISSUE 13 .......................................................... 74
COMMON ISSUE 14 .......................................................... 75
COMMON ISSUE 15 .......................................................... 75
COMMON ISSUE 16 .......................................................... 77
COMMON ISSUE 17 .......................................................... 80
COMMON ISSUE 18 .......................................................... 82
COMMON ISSUE 19 .......................................................... 83
ACL COMMON ISSUES & DISCOVERY SANCTIONS .................................. 85
CAUSATION ................................................................ 89
JNOV ASSIGNMENTS OF ERROR................................................. 91
AVONDALE INTERESTS SPECIFIC ASSIGNMENTS OF ERROR ........................ 107
SUMMARY ................................................................. 118

*58
EXPLANATION OF VIRILE SHARE CALCULATIONS ................................ 120
DECREE .................................................................. 122

PER CURIAM.
In the early 1990's, over one thousand individual law suits were filed in the 24th Judicial District Court by plaintiffs who were exposed to asbestos over the previous decades. Numerous manufacturers and producers of asbestos products were named as defendants and the Executive Officers of plaintiffs' employers. These cases were cumulated and consolidated for trial under the direction of Judge Jacob Karno. On December 20, 1994, the trial court issued a trial plan setting four consolidated trials, broken down into groups of eight, nineteen, fifty-eight, and a final group of 323. Over the course of the next several months, suits in the first two groups were settled. The remaining suits involved exposure to asbestos at three major shipyards. In an Order dated July 18, 1995, the trial court separated the remaining cases according to the site of exposure. This Order set the trial of the suits involving exposure at Avondale Shipyards for September 18, 1995. The claims of 129 Avondale employees were tried before one jury. The resulting judgments from that trial form the basis of this appeal.
The first two weeks of trial were consumed by pre-trial motions and jury selection. Opening statements began on September 29, 1995, and the trial continued over the course of the next six months. At the conclusion of trial, 118 plaintiffs were awarded damages and eleven were not. Most defendants were found liable, while several were exonerated.
The non-settling defendants, Asbestos Corporation Limited (hereinafter referred to as ACL), and the Executive Officers of Avondale Shipyard, as well as their insurers (hereinafter referred to as the Avondale Interests), have perfected the instant appeals. Owens Corning had also appealed, but settled and dismissed their appeals with all but two plaintiffs, Earlven Gauthe and Johnny Johnson. CBS Corporation, formerly known as Westinghouse Electric Corporation (hereinafter referred to as Westinghouse), settled and dismissed their appeals with all plaintiffs but Earlven Gauthe and Johnny Johnson after oral argument, but days before this opinion was rendered. In the interest of judicial economy and in attempt to simplify the issues, we have consolidated these matters for appeal purposes. At a hearing held by this Court, the appellants identified nineteen Common Issues. By Order dated May 20, 2000, these issues were ordered briefed, and on September 28, 2000 they were orally argued.
To facilitate the appeals regarding causation and quantum for individual plaintiffs, twelve groups of plaintiffs were established (Groups I-XII). The parties then briefed the issues specific to the ten plaintiffs comprising the Group I plaintiffs. Oral argument with respect to those Group I plaintiffs was held on October 26, 2000. However, immediately prior to oral argument this Court received notice from the U.S. Bankruptcy Court that Owens Corning had sought relief in that court. Because of the Stay Order issued by that court, this court has severed and stayed all appeals pertaining to Mr. Gauthe and Mr. Johnson, relative to all defendants and all issues therein. And because of the nature of the injuries received by Patrick Clark, *59 we have decided to dispose of the appeal in his case by separate opinion.[1] Therefore, this opinion relates only to Group I plaintiffs Alfred Adams, Lester Badeaux, Leroy Bonamour, William Boudreaux, Oscar Champagne, Roger Quave, and Alvin Robin.
The jury rendered a verdict in favor of each of these seven plaintiffs against ACL and six Avondale Executive Officers. In addition, the jury also found several other manufacturers and suppliers responsible either on a negligence and/or strict liability (unreasonably dangerous per se or failure to warn) theory. However, those parties either settled before trial or after judgment was rendered, and are not part of this appeal. Nonetheless, because of the virile share apportionment necessitated by the jury's findings, their liability or non-liability is an issue that has been raised by the defendants who have appealed.[2] Via a Judgment Notwithstanding the Verdict (JNOV), the trial judge reversed the jury's findings with respect to nine of those settling parties. Finally, included in those same JNOV rulings, the trial judge also increased most of the damage awards. Thus, in addition to the various arguments with respect to their own liability, ACL and the six Avondale Executive Officers also argue the incorrectness of the trial judge's grant of the JNOVs, and the correctness of the jury's finding of liability on the part of the settling defendants.
In an attempt to present this opinion in a logical and orderly fashion, we first turn to a discussion and resolution of the issues common to all of the defendants. We next turn to a general discussion of causation in asbestos cases, and the basic guidelines that we will apply in determining whether ACL and the settling defendants bear any responsibility to each of these seven plaintiffs. Finally, we will discuss and resolve the specific arguments raised by each appellant.

COMMON ISSUE 1:
Whether the trial court erred in cumulating, transferring, and consolidating cases in forming the 129-plaintiff trial group?
Appellants argue that the trial court erred in cumulating, transferring, and consolidating cases in forming the 129 plaintiff trial group. The brief filed by ACL does not specifically address the issue of consolidation. Rather, ACL adopts the position of Westinghouse and the Avondale Interests with regard to this issue, and though Westinghouse has since settled with plaintiffs, we relate the arguments as they briefed them. Specifically, Westinghouse argues that the manner in which the trial group was formed violated its right to an individualized determination of the claims. First, Westinghouse contends that the aggregation of claims was prejudicial because it confused the jury, prevented a fair and impartial trial, and gave the plaintiffs an undue advantage. Westinghouse argues that the repetition of accusations against it validated the claims regardless of the merits of each individual claim, effectively eliminating plaintiffs' burdens of proof. Second, Westinghouse claims that individual issues, which could defeat a particular plaintiffs claim, were lost or minimized due to aggregation. It claims that the responses on the jury verdict forms indicate the jury was not able to identify individual *60 products, their manner of use, and whether a particular plaintiff had been exposed to a particular product. Westinghouse contends that because of the numerous plaintiffs, witnesses, and exhibits it was impossible for the jury to make individual determinations whether its product was unreasonably dangerous, and whether the product had substantially contributed to the injury of a particular plaintiff, on a plaintiff-specific, defendant-specific, or product-specific basis.
Westinghouse supports its contentions with the assertion that the plaintiffs lacked the requisite commonality for aggregation of their claims. While Westinghouse acknowledges that all of the 129 plaintiffs worked at Avondale for some period of time, it argues there were significant differences among plaintiffs with regard to their length of employment, their work site, the amount of exposure, their lifestyle factors, their medical histories, and alleged injuries. In sum, Westinghouse says that the few common issues were overshadowed by these individual differences, making cumulation inappropriate.
The Avondale Executive Officers also contend that consolidation denied them the opportunity to defend each claim individually, resulting in a denial of their rights to due process. The Avondale Executive Officers[3] named in these lawsuits are James O'Donnell, George Kelmell, John Chantrey, J.D. Roberts, Steven Kennedy, and Peter Territo.[4] These men were employees of Avondale, working in the safety department, at various times from 1948 until 1976. The claimants alleged that the Executive Officers were negligent in the manner in which asbestos-containing products were used at Avondale, and for failing to protect the workers against known hazards of asbestos. The Executive Officers counter with the argument that the only evidence presented specific to a plaintiff against a particular executive officer was that the defendant worked at Avondale at the same time as the plaintiff. The Executive Officers point out that during this time the government required the use of asbestos products on all Navy vessels. The officers also contend that during this time the asbestos manufacturers concealed the dangers of asbestos exposure, and the government standards for asbestos exposure were inadequate. They argue that the length of the trial, coupled with the magnitude of evidence from the numerous plaintiffs, defendants, and experts confused the jury, and resulted in the imposition of liability against executive officer defendants when there was inadequate evidence.
The plaintiffs[5] contend that the issue of the appropriateness of consolidation has *61 already been addressed by this court. They point out that the defendants in a separate flight of cases applied for Supervisory Writs from the Order that set the cases for trial.[6] In that Writ Application, those defendants argued that they would be unduly prejudiced by having to defend numerous diverse claims. This Court denied the Writ Application, holding that the consolidation was within the broad discretion of the trial court under LSA-C.C.P. art. 1561. The plaintiffs argue that the holding in this Writ Application constitutes the "law of the case," and this issue should not be re-litigated.
Plaintiffs further argue that while the defendants have claimed the consolidation resulted in prejudice and denial of due process, they have failed to support these allegations with concrete examples. The plaintiffs point out that the trial court, in ruling on Avondale's post-verdict Motion for Judgment Notwithstanding the Verdict, held there was sufficient evidence to support a finding of liability against the executive officer defendants. The plaintiffs contend that if the consolidation had resulted in jury confusion, as alleged by the defendants, then the jury would have awarded damages to all of the plaintiffs, which they did not do. Plaintiffs point to the jury interrogatories, which found some defendants liable to some plaintiffs, and other defendants not liable at all.

DISCUSSION:
While we are not satisfied that the "law of the case" doctrine is controlling in this situation, we are satisfied that LSA-C.C.P. art. 1561 supports the trial court's decision to consolidate these matters. That article provides:[7]
A. When two or more separate actions are pending in the same court, the section or division of the court in which the first filed action is pending may order consolidation of the actions for trial after a contradictory hearing, and upon a finding that common issues of fact and law predominate.
B. Consolidation shall not be ordered if it would do any of the following:
(1) Cause jury confusion.
(2) Prevent a fair and impartial trial.
(3) Give one party an undue advantage.
(4) Prejudice the rights of any party.
Westinghouse argues that the consolidation advantage for the plaintiffs was that the repetition of accusations against it validated the claims regardless of the merits of each individual claim, effectively eliminating plaintiffs' burdens of proof. We disagree. Had the consolidation effectively eliminated plaintiffs' burdens of proof, the jury would have awarded damages to all 129 plaintiffs, which they did not do. The claims of eleven plaintiffs were rejected.
Likewise, the appellants' contention that the consolidation resulted in jury confusion is without merit. The jury completed interrogatories for each plaintiff. Each set of interrogatories listed each defendant. *62 Not all defendants were found liable to all plaintiffs. The appellants have not shown with any specificity how the jury was confused by consolidation, nor have they shown how they were prejudiced, or that the trial was impartial.
Perhaps consolidation created an unduly burdensome situation for all parties, and perhaps on hindsight consolidating in this situation was not the best way to dispose of these cases. However, we find nothing in the record, nor have specific references in the record been pointed out to us, to show how any due process rights were violated or any prejudice or unfair advantage resulted. If any manifest error by the trial court or jury occurred because of consolidation, it will be corrected in this appeal.

COMMON ISSUE 2:
Whether by proceeding to judgment on less than all claims presented in each of the nine separate cases, the trial created non-appealable partial final judgment?
Westinghouse (and ACL by adoption) argues that in proceeding to judgment in less than all claims presented in each of the nine separate cases from which the 129 plaintiffs were drawn, the trial court created non-appealable partial final judgments. Westinghouse explains that the judgments before this Court at this time are not appealable until all the claims in each case are adjudicated. This issue was not briefed by the Avondale Interests.
The plaintiffs counter with the assertion that the 129 cases adjudicated in this trial were completely resolved. We agree. The cumulation of these cases for trial did not destroy the independence of each case. A separate judgment was entered in each case adjudicating each plaintiffs claim against each defendant. An appeal may be taken from a final judgment. LSA-C.C.P. art. 2083. "A judgment that determines the merits in whole or part is a final judgment." LSA-C.C.P. art. 1841. There were no partial final judgments rendered in the record before us. A partial final judgment is defined in LSA-C.C.P. art. 1915 as "any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties." There are no parties in any of the cases before us who have unresolved claims pending. The jury rendered findings and the trial judge issued judgments determining the merits of the claims. The judgments rendered are appealable.

COMMON ISSUE 3:
Whether the causes of actions did not accrue until after October 1, 1976, and thus the claims against the executive officer defendants are barred by the Louisiana worker's compensation statutory immunity?
Avondale Interests argue that the plaintiffs are prohibited from suing them in tort because of workers' compensation statutory tort immunity. In support of their position, the Avondale Interests cite Cole v. Celotex, 599 So.2d 1058 (La.1992), and cases cited therein, which, they argue, hold that a plaintiffs cause of action does not accrue until he has "contracted" his disease.
Louisiana Workers' Compensation Law, specifically LSA-R.S. 23:1032, was amended, effective Oct. 1, 1976, to specifically prohibit negligence suits against Executive Officers for work-related injuries. The Avondale Interests argue that the plaintiffs' causes of action accrued after October 1, 1976, and thus they are prohibited from suing the Avondale Executive Officers in tort for damages caused by negligence. A determination of when plaintiffs' cause of action accrued affects whether pre-1976 law or post-1976 law applies. Defendants argue that the evidence shows *63 that plaintiffs did not contract their asbestosis and cancers until well after October 1, 1976, and thus the plaintiffs' causes of action accrued after that date, and therefore, the Executive Officers are immune from tort liability. They also argue that mere exposure to asbestos is not enough to establish a cause of action under the traditional tort principles.
Plaintiffs also cite Cole for their position that plaintiffs' causes of action against the Executive Officers accrued at the time of their tortious exposures to asbestos-containing products, most of which occurred prior to October 1, 1976, and therefore, their causes of action arose under pre-amendment R.S. 23:1032, which allows plaintiffs to sue the Avondale Executive Officers in tort for negligence. Plaintiffs argue that Cole clearly changed the methodology for determining what law applies in long-latency tort cases.
The Louisiana Supreme Court in Cole considered the application of the new Comparative Fault Law[8] to long-latency tort cases where the plaintiffs' tortious exposures took place prior to 1980, but the diseases manifested and the suits were filed after the enactment of comparative fault. The Cole court expressly declined to establish new criteria for determining when a plaintiffs tort cause of action accrued. The Cole court followed traditional tort law, which holds that a plaintiff's cause of action accrues when a party has a right to sue. Three elements are required: fault, causation, and damages. The court recognized that "Louisiana is generous in its conception of damages, the slightest being sufficient to support an action." Cole, supra, footnote 15. In his concurrence, Justice Dennis recognized that a cause of action may accrue before a plaintiff sustains all of his damages.
Though Cole's holding did not directly address the applicability of R.S. 23:1032, it did discuss that statute in the context of long-latency diseases. The Cole court recognized that it was well-settled that the 1976 amendment to R.S. 23:1032 could not be retroactively applied to divest parties whose causes of action accrued before the amendment was enacted, citing, among other cases, Faciane v. Southern Shipbuilding Corp., 446 So.2d 770 (La.App. 4th Cir.1984), which outlines the "contraction test" for determining when a plaintiff's cause of action accrues.
Cole discussed the inherent difficulties in applying the "contraction" test, noting that in asbestosis cases the "lengthy latency period renders efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally."[9] The Supreme Court left for another day, however, "resolution of the continued viability of the contraction theory in the context in which it arose" (Cole, 599 So.2d 1058, note 54), as neither applicant contested the Third Circuit's factual findings nor its application of the "contraction" test for the cause of action's accrual. Cole, therefore, did not go so far as to formulate a new "significant exposures" test, in long-latency cases, to determine when a plaintiff's cause of action accrues. What Cole did, in the context of R.S. 23:1032, was open the door to question whether the "significant exposures" test should be used, rather than the traditional tort models such as the "contraction" test, to determine *64 the application of all laws in a long-latency disease case.
Since the Louisiana Supreme Court's ruling in Cole, many Louisiana appellate cases have discussed the effects of Cole's holding on the application of other laws (such as workers' compensation, products liability, prescription) in long-latency tort cases. These courts found that Cole called into question the viability of the contraction theory as a method for determining the accrual of a cause of action in long-latency disease cases.
The Supreme Court did not revisit this specific Cole issue again until Walls v. American Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262. There, the court considered the application of R.S. 23:1032 to wrongful death cases when the decedent's occupational exposures occurred entirely before the statute was amended, but the death did not occur until years after the amendment's effective date. The Walls plaintiffs asked the court to abandon the traditional approach to determining the applicable law in a tort suit and employ instead the "tortious exposures" test articulated in Cole. The plaintiffs interpreted Cole to require all long-latency occupational lung disease cases to be governed by the law in effect on the date the victim was exposed to the diseasecausing agent. The Supreme Court disagreed with such an expansive reading of Cole. The court found that the wrongful death plaintiffs' cause of action did not arise (accrue) until the decedent's death, and therefore, R.S. 23:1032 as amended applied to plaintiffs' cause of action, barring their wrongful death suits against Executive Officers:
The survival and wrongful death actions are totally separate and distinct causes of action that arise at different times and allow recovery of completely different damages. Guidry [v. Theriot], 377 So.2d 319 [(La.1970)]. Cole established the "exposure theory" for determining the applicable law within the context of the direct tort action and survival action. "[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Landgraf [v. USI Film Products], 511 U.S. [244] at 265, 114 S.Ct. [1483] at 1497, 128 L.Ed.2d [229] at 252 [(1994)]. Therefore, Cole's rationale cannot apply to the instant case involving a wholly distinct cause of action for wrongful death.
Walls, 740 So.2d at 1273 (Emphasis added.) The emphasized language in the above quote strongly suggests the viability of the "exposure theory" in a direct tort action.
Borrowing from the rationale of Cole, the "significant exposure" test for determining when a cause of action accrues in a long-latency disease is "when pre-act exposures are significant AND such exposures later result in the manifestation of damages." Cole, supra at p. 1066. We hold that tortious exposures are significant when asbestos dust has so damaged the body that the fibrogenic effects of its inhalation will progress independently of further exposure. This application of the "significant exposure" test is not materially different from the application of the "contraction" test in Faciane v. Southern Shipbuilding Corp., supra. In Faciane the Fourth Circuit stated:
... in the unique circumstances presented by cases of cumulative diseases such as silicosis, it is the contraction of the disease which creates a cause of action and not the later manifestation of the consequences of that disease.
* * * *
... once silica dust has so damaged and maimed the body that the fibrogenic *65 effects of silica inhalation will progress independent of further exposure, a disease has been contracted.
Similarly to the Fourth Circuit in Faciane, we hold that in order to establish when their cause of action accrued, plaintiffs will have to show more than mere exposure to asbestos. Plaintiffs will have to present evidence that the exposures were significant, and that the asbestos exposure started the disease process in their lungs. While the plaintiffs cannot document each and every exposure and the resulting consequence, expert testimony based on medical and scientific studies can establish whether the pre 1976 exposures were significant enough to produce injury.
Each expert medical doctor in this case testified that he used several criteria to diagnose an asbestos-related disease. Each doctor required a history of exposure to asbestos, and a latency period before the manifestation of symptoms. The doctors' opinion on what constituted significant exposure, however, varied.

CONCLUSION
Cole v. Celotex and Walls v. American Optical have validated the use of "significant exposures" test for determining the applicable law in a long-latency tort cause of action. The law in effect at the time of the tortious exposures will apply if the evidence proves that the exposures were significant AND resulted in the later manifestation of damages. There is no bright line test to establish significant exposure in cases involving latent diseases. However, expert medical testimony establishing that the exposure was sufficient enough to begin the disease process is acceptable to fix the time period for accrual of the cause of action.
Plaintiffs have the burden to demonstrate by a preponderance of the evidence that damages were caused by pre-1976 significant exposures in order to have a cause of action against the Avondale Executive Officers. The courts must determine if a plaintiff has borne his burden of proof on a case by case basis. In the group of seven plaintiffs that we consider today, the record contains sufficient references to pre-1976 asbestos exposures through evidence of their work history and the testimony of medical experts describing the beginning of the disease process to allow each to meet his burden of proof.

COMMON ISSUE 4:
Whether the plaintiffs' claims against the executive officer defendants are barred by the provisions of the Longshoreman and Harbor Worker's Compensation Act?
Avondale Executives argue that the LHWCA is the plaintiffs' sole remedy against Avondale and any Avondale employee. Under the LHWCA plaintiffs are prohibited from suing co-employees (Executive Officers) in tort. Plaintiffs contend, citing Poche v. Avondale Shipyards, Inc., 339 So.2d 1212 (La.1976), that the LHWCA and the State Workers' Compensation scheme exist as concurrent remedies, and that the existence of the LHWCA does not preclude plaintiffs from electing to pursue their remedies under State law.

ANALYSIS

Concurrent Remedies
In 1972, Congress extended the LHWCA to provide coverage to traditional maritime workers who worked landward beyond the shoreline of the navigable waters of the United States. In 1976, the Louisiana Supreme Court addressed whether LHWCA was the exclusive remedy for a shipyard worker in Poche v. Avondale Shipyards, Inc. In Poche, Curtis Poche, Sr. was engaged in new ship construction in a shipyard area located entirely over land when a scaffold fell, causing *66 him to be fatally injured. His widow and children filed a third-party negligence action for wrongful death under state law against Avondale Shipyards, Inc., and certain named Executive Officers of Avondale Shipyards pursuant to LSA-R.S. 23:1101. The defendant Executive Officers filed Exceptions of No Right and No Cause of Action, claiming that the benefits afforded by the LHWCA were available to plaintiffs, and thus excluded all rights, remedies, and benefits otherwise provided by the Louisiana Workers' Compensation Act.
The Court found, after reviewing the cases decided by the United States Supreme Court, that state compensation laws could be constitutionally applied concurrently with the federal LHWCA compensation system. Poche, 339 So.2d at 1217. Further, if a plaintiff chose to proceed under state law, he had the right to the benefits of the entire body of state compensation law, even if the state scheme provided benefits in addition to or in conflict with the federal scheme. In Poche, this meant that Poche's widow could sue the Avondale Executive Officers in tort, a remedy available in state law against executive co-workers prior to the 1976 amendment of R.S. 23:1032, but not available under the federal scheme.
After Poche, the United States Supreme Court in Sun Ship Inc. v. Pennsylvania, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980), acknowledged that State compensation law and the LHWCA provide concurrent remedies. In Sun Ship, the Court held that the extension of federal jurisdiction landward beyond the shoreline of the navigable waters under the 1972 amendments of the LHWCA supplements, rather than supplants, state compensation law. The Court further held that the 1972 amendments cannot fairly be understood as preempting workers' state remedies.
The Louisiana Supreme Court revisited the Poche issue in Beverly v. Action Marine Services, Inc., 433 So.2d 139 (La. 1983). In Beverly, the plaintiffs brought suit to recover benefits under the Louisiana Workers' Compensation Act for the death of their son. The defendants filed peremptory exceptions, alleging that the plaintiffs' exclusive remedy was under LHWCA. The Beverly court acknowledged the Sun Ship case, stating that concurrent remedies continued to exist under state law and federal law, that the amended LHWCA was not exclusive, and that state regulation of worker injuries is even more clearly appropriate ashore than it is upon navigable waters. Beverly, 433 So.2d at 141. Six years later, the Louisiana Supreme Court, in Logan v. Louisiana Dock Company, Inc., 541 So.2d 182 (La. 1989), reaffirmed the existence of concurrent state and federal compensation remedies.
Avondale Interests argue that Poche does not apply because the plaintiffs did not present evidence that they worked exclusively on land, citing two cases, Roberts v. Avondale Shipyards, Inc., 537 So.2d 808 (La.App. 5th Cir.1989), and Wixom v. Travelers Ins. Co., 357 So.2d 1343 (La. App. 4th Cir.1978), for this argument. We find Roberts is distinguishable because it involved a plaintiff who pursued and received LHWCA benefits prior to suing in tort. Wixom is also distinguishable. In Wixom the court found that the LWHCA remained the exclusive remedy for plaintiff Wixom's injuries, because he was a traditional maritime worker injured while working entirely on a navigable waterway, not in the land-based "twilight zone" of concurrent state and federal coverage.
Avondale Interests argues that the plaintiffs' exclusive remedy is under the LHWCA because of the preemptive language of LSA-R.S. 23:1035.2 of the Louisiana *67 Workers' Compensation Act. LSA-R.S. 23:1035.2 was added by Acts 1989, No. 454 § 2, and became effective January 1, 1990. This statute reads as follows:
No compensation shall be payable in respect to the disability or death of any employee covered by the Federal Employer's Liability Act, the Longshoremen's and Harbor Worker's Compensation Act, or any of its extensions, or the Jones Act.
LSA-R.S. 23:1035.2 now divests plaintiffs of the concurrent state and federal remedies. Smith v. Gretna Mach. and Iron Works, 94-369 (La.App. 5th Cir.11/16/94), 646 So.2d 1096, 1097.
Avondale's argument, that under the language of R.S. 23:1035.2, the plaintiffs' claims fall exclusively under LHWCA, is without merit. Prior to the enactment of R.S. 23:1035.2, a worker who was covered by both the Louisiana Workers' Compensation Act and the LHWCA was allowed to choose between the two schemes. Sun Ship, supra; Logan v. Louisiana Dock., supra. Status for purposes of federal coverage does not bar recovery under State law. Beverly v. Action Marine Services, Inc., supra, citing Hahn v. Ross Island Sand & Gravel Co., 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959).
The fact that plaintiffs may be classified as longshoremen does not preclude them from bringing a claim in tort under Poche. The LHWCA before 1972 had no application to injuries occurring on land, and state compensation schemes constituted the sole remedy available even for a traditional maritime worker working on land. If a particular plaintiffs claim accrued or became vested before 1972, then state law applies. If the plaintiffs claim accrued after 1972, then under Poche, up to the effective date of La. R.S. 23:1035.2 (January 1, 1990), the plaintiffs have concurrent state and federal remedies.
The Avondale defendants cite Cobb v. Sipco Services & Marine, Inc., 1997 WL 159491 (E.D.La.), which addressed the issue of whether the exclusive remedy provision of LHWCA affects the availability of state tort relief for a plaintiff injured in a shipyard. Cobb was injured in 1994 and sued his borrowing employer for punitive damages under LSA-C.C. art. 2315.3, after receiving LHWCA compensation. The trial court held that this state tort claim, because it involved a remedy outside the state compensation scheme (punitive damages), directly conflicted with the LHWCA and, therefore, federal preemption applied. This cause of action clearly arose after the 1976 amendment to R.S. 23:1032, and the 1990 amendment to R.S. 23:1101. Moreover, we find that Cobb is distinguishable because the plaintiffs in Cobb sought LHWCA recovery first.

CONCLUSION
We find that the Louisiana Supreme Court case of Poche v. Avondale Shipyards, Inc., 339 So.2d 1212 (La.1976), controls for the pre 1976-injuries. It holds that LHWCA and state workers' compensation schemes provide concurrent remedies for these maritime workers who work over land; plaintiffs may choose to proceed under either scheme. Further, if a plaintiff chooses to proceed under the state compensation scheme and makes no claim under LHWCA, he may avail himself of the entire body of state compensation law, not merely the portions that do not conflict with the federal scheme. Thus, the plaintiffs' choice to proceed under state law allows them to sue the Executive Officers in tort, under pre-amendment R.S. 23:1032 and 23:1101, a remedy not available under the LHWCA.

COMMON ISSUE 5:
Whether the trial court improperly limited defendants' access to evidence *68 and use of expert witnesses regarding medical issues?
ACL and the Avondale Interests argue that the trial court erred by limiting them to one Independent Medical Examination (IME) of each plaintiff and to one examination of any tissue samples by a pathologist. They argue that this ruling limited them to a single medical defense and impaired their ability to present certain scientific and medical defenses.
On September 21, 1992, the trial court issued Case Management Order No. 1. Subsection 8(H) states in pertinent part:
The defendants shall have, upon request and at their own expense, an independent medical examination conducted of each plaintiff. Additional medical examinations will require a court order. However, upon leave of Court, a plaintiff may be re-examined by any defendant if the original examination was conducted more than one year prior to the trial date or there has been a change in diagnosis by plaintiff's treating physicians and/or expert witnesses. Reports of IMEs shall be obtained and provided immediately to counsel for plaintiffs.
The plaintiffs argue that the Case Management Order was produced by a joint effort of the parties and was not objected to by the defendants. Writs were not taken on the issue.
The general rule regarding medical examination of a party is governed by LSA-C.C.P. art. 1464, which states as follows:
When the mental or physical condition of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control, except as provided by law... The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by who it is to be made. White v. State Farm Mut. Auto. Ins. Co., 95-551 (La.App. 3rd Cir.7/17/96), 680 So.2d 1.
The defendants claim that they were prejudiced by the trial court's ruling because they were not allowed to produce expert witness testimony concerning the degree of danger presented by the different types of asbestos. Also, the defendants allege that they were prejudiced by the fact that each plaintiff was allowed to produce his/her treating physician to testify at trial while they were limited to a single medical witness regarding each plaintiff.
The defendants' allegations appear to suggest that the trial court limited their ability to call expert witnesses, but the Case Management Order in no way curtails this right. In fact, the Case Management Order provides the defendants with the ability to petition the trial court for additional medical examinations if necessary.
The trial court is afforded wide discretion in granting physical examination of parties litigant and in setting the guidelines for such examinations. Walker v. Marcev, 427 So.2d 678 (La.App. 4th Cir. 1983); writ denied, 433 So.2d 182 (La. 1983). The court may subject the examination to reasonable restrictions or conditions, if special circumstances are shown. Id. at 680.
The enormity and complexity of the issues and the number of plaintiffs in this case warranted reasonable restrictions on discovery. Special circumstances were shown and the parties agreed on the Case *69 Management Order. The defendants were not prejudiced by this ruling because their ability to call expert witnesses was not limited as they claim. The only limitation was on the number of IMEs allowed, and the trial court made provisions for additional IMEs if warranted. The trial court did not abuse its discretion in this matter. This argument has no merit.

COMMON ISSUE 6:
Whether the jury panel was unfairly influenced by plaintiffs' counsel's improper statements, comments, arguments and actions?
This issue was not specifically briefed by the parties, and therefore is considered abandoned. Uniform Rules of Louisiana Courts of Appeal, 2-12.4.

COMMON ISSUE 7:
Whether the trial court erred in its allocation of peremptory challenges?
Westinghouse argues that the trial court erred in its allocation of peremptory challenges. ACL has adopted Westinghouse's position on this issue. In support of its position ACL cites LSA-C.C.P. art. 1764(C), which allows an equal number of peremptory challenges to each side. ACL takes issue with the trial court's determination that there were only two sides to this case, claiming it was error to force ACL to share its peremptory challenges with all other defendants, including some who pursued third party demands against other defendants.
The plaintiffs contend that there were only two sides in this case and nothing was presented to the jury that portrayed the defendants as adverse. They further point out that challenges to the impanelment or composition of the jury in a civil case must be resolved by supervisory writ and cannot be raised on appeal after the trial. Pretermitting the issue of whether defendants waived their objections to the impanelment of the jury, we see no error in the trial court's allocation of peremptory challenges.
LSA-C.C.P. art. 1764 provides in pertinent part:
B. If trial is by a jury of twelve, each side is allowed six peremptory challenges. If there is more than one party on any side, the court may allow each side additional peremptory challenges, not to exceed four.
C. Each side shall be allowed an equal number of peremptory challenges. If the parties on a side are unable to agree upon the allocation of peremptory challenges among themselves, the allocation shall be determined by the court before the examination on the voir dire.
For purposes of this article, the number of sides in a lawsuit is determined by the legal posture of the parties. Smith v. State Farm Ins. Co., 446 So.2d 1269 (La.App. 4th Cir.1984), writ denied 449 So.2d 1356 (La.1984). For the purposes of exercising peremptory challenges, multiple party defendants with adverse interests may constitute a single side. Id. The trial court's determination of the number of sides in a lawsuit is subject to the manifest error standard of review. See Atkinson v. Celotex, 93-924 (La.App. 3rd Cir.3/2/94), 633 So.2d 383.
Arguably, as in Atkinson, because the liability of the Avondale Interests was based on theories different from that of the manufacturers, they are placed in a different posture and thus perhaps they were entitled to additional challenges. However, the Avondale Interests did not raise this issue at the trial level or brief it before this court. Consequently, as to them, the issue of inadequate peremptory challenges was waived. Atkinson has no application to other defendants who are suppliers or manufacturers.
*70 Though defendants filed cross-claims, the thrust of their defense at the trial were factors other than third-party liability. Based on our review of the record and the various defenses raised by the parties, we cannot say the trial judge abused his discretion in the allocation of peremptory challenges.

COMMON ISSUE 8:
Whether the trial court erred in allocating time for opening and closing argument equally between plaintiffs and defendants as a group, and then requiring defendants to divide up the time between them so as to unfairly limit defendants' closing statement?
On appeal, Westinghouse argues that due to the limited time allotted, it was prevented from fully explaining its position in closing arguments. The record indicates otherwise. ACL adopted Westinghouse's argument on this issue.[10] The record indicates ACL was able to fully present its position in the time allotted. In its closing argument, ACL explained that it was not a manufacturer of any products; rather, it owned a mine containing asbestos, a naturally occurring substance. ACL went on to argue that when the dangers of asbestos dust were discovered, asbestos was not banned; instead, the levels of the dust were regulated. It discussed the fact that none of the plaintiffs were exposed to raw asbestos fiber. They were exposed to dust from a finished product. Additionally, ACL explained to the jury that it was bound by the laws of Quebec, which prevented it from complying with the discovery requests propounded by the plaintiffs. Finally, ACL discussed its position as to the lack of evidence presented by the plaintiffs.
We find no merit to the argument that the time limitation operated to ACL's detriment.

COMMON ISSUE 9:
Whether the trial court erred in conducting the trial in a manner that created undue pressure on defendants to put on a joint defense in a compressed time frame?
ACL (by adoption of Westinghouse's brief on this issue) argues it was forced to participate in a general defense with all the other defendants, and thus the jury was unable to separate plaintiffs who presented no evidence of exposure to their product. ACL suggests that the trial court should have declared a mistrial after the plaintiffs' case lasted five months because it was clear that the defendants would not have an opportunity to present all of their facts. This issue is raised in the Avondale Interests' brief.
The plaintiffs argue that the appellants have failed to point to a single fact they would have proved, or evidence they would have introduced had they not presented a joint defense, or had they been given more "trial days." Plaintiffs contend there was no error egregious enough to support the appellants' assertion that the trial court should have ordered a mistrial.
Appellants have failed to demonstrate any specific instances of how they were prevented from fully presenting their position. The jury interrogatories show that not all plaintiffs recovered from the same defendants, and several defendants were exonerated by the jury. We find no merit in this argument.

COMMON ISSUE 10:
Whether the trial court erred in admitting into evidence and allowing plaintiffs' counsel to make statements *71 and arguments about documents without establishing a proper evidentiary foundation.
(See discussion under Common Issue No. 13)

COMMON ISSUE 11:
Whether the trial court improperly limited defendants' ability to challenge the reliability and credibility of plaintiffs' diagnoses, including precluding defendants from presenting the testimony of Avondale employees regarding their participation in the asbestos screening process?
ACL and the Avondale Interests argue that the trial court erred by not allowing them to introduce evidence of a rescinded contingency fee contract between attorney David Nutt (not an attorney in this case) and Pulmonary Advisory Services, Inc. ("PAS"). PAS employed Dr. Larry Mitchell, the doctor who originally diagnosed many former Avondale employees with asbestos-related diseases. The issue was originally raised in writ number 96-C-067, which was denied by this Court. This Court held that the trial court did not err in denying the defendants the right to introduce the contingency fee contract or question the plaintiffs about it without first establishing its link to the plaintiffs involved or until a representative of PAS was called as a witness.
The appellants further argue that the trial court erred by failing to allow the testimonies of William Tucker and Walter Floyd into evidence. Tucker and Floyd are former Avondale employees who would have allegedly testified that they were mis-diagnosed with asbestos-related diseases by Dr. Richard Kuebler. The issue was originally raised in writ number 96-C-087, which was denied by this Court. This Court held that the trial court did not abuse its discretion by failing to allow the testimonies of Tucker and Floyd into evidence. The depositions of Tucker and Floyd were proffered by the defense.

PAS CONTINGENCY FEE CONTRACT
The defendants allege that evidence of a contingency fee contract between PAS and David Nutt was necessary to "impeach the medical evidence upon which much of the plaintiffs' cases relied." The trial court held that the evidence was not relevant under LSA-C.E. art. 403 and that it could not be used to attack the credibility of any witness under LSA-C.E. art. 607 since no representative of PAS was called as a witness in the suit.
David Nutt is a plaintiff's attorney in Mississippi. He sent many of his clients, some of whom were employees of Avondale, to PAS to be tested for asbestos-related diseases. Nutt allegedly entered into a contingency fee arrangement with PAS and promised them fifteen percent (15%) of the gross amount of any settlement or judgment. This contract was later rescinded. Nutt was not an attorney in the present case, was in no way affiliated with present counsel, and had nothing to do with the plaintiffs as a whole. He was not called as a witness. PAS is outside the subpoena power of the trial court and its representative, Glenn Pitts, was never called as a witness in the present case.
The trial court first stated that the evidence was inadmissible because it was not being used to attack the credibility of a witness. "The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked."[11] The appellate court's review of credibility determinations is constrained *72 by the manifest error standard, which demands that finding of fact by the trial court be given great deference and disturbed only when clearly wrong. McCraw v. Louisiana State University Medical Center, 627 So.2d 767 (La.App. 2nd Cir.1993); writ denied, 94-0001 (La.3/11/94), 634 So.2d 399.
Glenn Pitts, the representative of PAS, was not called as a witness. Neither was David Nutt or Dr. Larry Mitchell. Evidence of a contingency fee contract between Nutt and PAS would have only been relevant to attack the credibility of PAS or Dr. Mitchell. Since neither of these individuals were called as witnesses, and their diagnoses of the plaintiffs were not introduced into evidence, the contingency fee arrangement was inadmissible for impeachment purposes.
Even if the evidence were relevant, the trial court ruled it inadmissible because of its likely prejudicial impact on the jury. LSA-C.E. art. 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
A trial judge's assessment of the probative value of evidence is afforded great weight. Green v. Claiborne Elec. Co-op, Inc., 28,408 (La.App. 2nd Cir.6/26/96), 677 So.2d 635. In the absence of a clear abuse of discretion in assessing the probative value of evidence, the ruling of the trial court will not be reversed on appeal. Id. at 639.
The trial court held that evidence of a contingency fee contract between PAS and David Nutt was not only irrelevant, but would be prejudicial and misleading. The contract was rescinded, David Nutt had no interest in the present case, and the test results from PAS and Dr. Mitchell were not introduced into evidence. A second set of medical tests were performed by other doctors and these reports were entered into evidence at trial. The trial court did not err in excluding the rescinded contingency fee contract from evidence.

TESTIMONIES OF TUCKER AND FLOYD
William Tucker and Walter Floyd were security guards at Avondale who allegedly were never exposed to asbestos. When Avondale learned that many of its employees were being tested for asbestos-related problems, it sent Tucker and Floyd to be tested. Tucker and Floyd were tested at PAS by Dr. Richard Kuebler. They both made false statements that they had been exposed to asbestos at the Avondale facility and signed affidavits to that effect. Both men were diagnosed by Dr. Kuebler as suffering from an asbestos-related disease.
The defendants attempted to introduce the testimonies of these two men to impeach the credibility of the plaintiffs' testing for asbestos-related diseases since both men were allegedly misdiagnosed. Neither Tucker or Floyd are parties to this suit. The trial court held that their testimonies were inadmissible because they were irrelevant to the proceedings and were not being used to impeach the credibility of a witness.[12] Dr. Kuebler was not called as a witness by either party and the testing performed by him and Dr. Mitchell at PAS was never introduced into evidence. Plaintiffs argue that introduction of this evidence would have been prejudicial to the plaintiffs and would have far outweighed its probative value. Evidence may be excluded if its probative value is substantially outweighed by the danger of *73 unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. LSA-C.E. art. 403. The trial court is vested with wide discretion in determining relevancy of evidence and its ruling will not be disturbed on appeal absent a showing of manifest abuse of that discretion. Hooker v. Super Products Corp., 98-1107 (La.App. 5th Cir.6/30/99), 751 So.2d 889, 909, citing Earhart v. Brown, 97-522 (La.App. 5th Cir.10/28/97), 702 So.2d 976, 984. The trial court did not abuse its discretion in excluding this evidence.

COMMON ISSUE 12:
Whether the trial court erred in allowing plaintiffs' expert witness reports to be admitted into evidence and reviewed by the jury during deliberations, and by admitting expert reports without the experts present to testify?
ACL (by its adoption of Westinghouse's brief on this issue) argues that the trial court erred by admitting medical reports into evidence that were generated by non-treating medical experts when those experts were not called as witnesses. Also, they allege that the trial court erred by admitting medical reports into evidence that were generated by medical experts who were called as witnesses, because this improperly allowed the jury to view the reports during deliberation. ACL further argues that medical reports submitted into evidence are hearsay and inadmissible because they do not fall under any of the exceptions listed in Code of Evidence article 803. Appellants rely on Butler v. Overnite Transportation, 444 So.2d 676 (La. App. 5th Cir.1984), and Ewell v. Schwegmann Giant Super Markets, 499 So.2d 1192 (La.App. 5th Cir.1986), which they contend held that doctor's reports are hearsay and cannot be used in lieu of testimony.
Avondale Interests argue that the written reports of plaintiffs' medical experts who testified at trial were improperly admitted into evidence because the live testimony is the "best evidence." They also argue that since the jurors could not take notes, the admission of plaintiffs' medical reports created an unfair advantage with the jury having "notes" for plaintiffs' experts' direct testimony but no notes for the cross-examination. ACL also adopted Avondale Interests' argument.

MEDICAL REPORTS ADMISSIBILITY:
The cases, Butler and Ewell, cited by appellants are distinguishable from this case. These cases held that medical reports cannot be used in lieu of testimony to establish the facts therein. However, in this case all the plaintiffs' medical experts testified, all were subject to cross-examination, and their reports were not used in lieu of testimony. Therefore, the hearsay rule does not apply. With regard to these seven plaintiffs, Dr. Gaziano, who diagnosed Alfred Adams, Lester Badeaux, and William Boudreaux, testified on December 12, 1995. Dr. Zimmet, who diagnosed Alfred Adams, Oscar Champagne, and Alvin Robin, testified on November 30, 1995 and December 1, 1995. Dr. Casolaro, who diagnosed Leroy Bonamour, testified on November 15, 1995. Dr. Lorino, who diagnosed Roger Quave, testified on October 16, 1995.
Medical records maintained by a physician in his regular course of business as a provider of medical services are admissible under the "business records" exception to the hearsay rule. LSA C.E. art. 803(6); Gilchrist v. Ozone Spring Water Co., 93-2515 (La.App. 4th Cir.6/30/94), 639 So.2d 489. Also, statements for purposes of medical treatment and medical diagnosis in connection with treatment are admissible under the exceptions to the hearsay *74 rule. LSA C.E. art. 803(4); Dardeau v. Ardoin, 97-144 (La.App. 3rd Cir.11/5/97), 703 So.2d 695, 697. Therefore, we find that the trial court did not err in admitting both the plaintiffs' and defendants' experts' medical reports.
The Avondale Interests have also alleged that the trial court erred in allowing certain medical reports into evidence in violation of the "best evidence rule" because expert witnesses had already testified to the information contained within them and "the direct testimony of experts is the best evidence of their opinions."
The "best-evidence" rule is to be applied sensibly and with reason. State v. Sartain, 98-0378 (La.App. 4th Cir.12/13/99), 746 So.2d 837, 848. The trial court has broad discretion in determining the admissibility of evidence. Furthermore, courts are to resolve the admissibility of evidence in favor of receiving the evidence. Dardeau v. Ardoin, supra, at 697. Any prejudice caused by the introduction of medical reports by plaintiffs' doctors was neutralized by the introduction of the medical reports of the doctors who examined the plaintiffs and testified on behalf of the defendants.

MEDICAL REPORTS IN JURY DELIBERATIONS:
Defendants argue that they were prejudiced because the jury was allowed to review the reports that contained the plaintiffs' experts' direct testimony during deliberations. We find this argument without merit. The pre-revision version of LSA-C.C.P. art. 1794(B) stated:
B. The court may allow the jury to take with them any object or writing received in evidence, except depositions and except as otherwise provided in the Louisiana Code of Evidence.
The trial court properly admitted the medical reports into evidence and therefore under 1794(B) the trial court did not abuse its discretion in allowing the jury to take these reports to deliberations. The reports were not depositions or verbatim transcripts of the medical testimony. Both the plaintiffs' and defendants' reports were allowed in the jury deliberations to assist the jury's recollection of individual plaintiffs and their claims. Absent a manifest abuse of discretion, the judgment of the trial court must be affirmed.

CONCLUSION:
The medical experts' reports for both the plaintiffs and defendants were properly admissible under LSA-C.E. art. 803(4) and 803(6). The medical reports were not used in lieu of testimony as all the plaintiff doctors testified at trial and were subject to cross-examination. Since the medical reports were properly admitted into evidence, the trial court did not commit manifest abuse of discretion in allowing the jury to review reports that were received into evidence under LSA C.C.P. Art. 1794.

COMMON ISSUE 13:
Whether the trial court erred by allowing plaintiffs' counsel to testify during cross-examination.
Common Issue Numbers 10 and 13 are more easily addressed together. The statements allegedly made by plaintiffs' counsel, and the documents to which they refer (Issue No. 10), are not identified, nor is the alleged testimony by plaintiffs' counsel (Issue No. 13). These assignments of error suffer from a lack of specificity.[13]
The Avondale Executive Officers' brief denotes several instances of the alleged *75 "testimony of counsel." After reading the record, we find that the questions of plaintiffs' counsel cited by the Avondale Interests are within the scope of cross-examination. When a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. Generally, leading questions should be permitted on cross-examination. LSA-C.E. art. 611(C). In Louisiana, wide latitude is permitted on cross-examination. The trial judge determines what is and what is not relevant, and his rulings are not disturbed on appeal in the absence of a clear showing of an abuse of this broad discretion. Jeansonne v. Quinn, 95-821 (La.App. 5th Cir.4/16/96), 673 So.2d 1100. See also Hill v. Leach, 98-1817 (La.App. 3rd Cir.4/21/99), 734 So.2d 116.
In brief, appellants refer to the questions at Vol. 69, pages 17, 202 and 17, 204. We note that appellants did not object to the questions at trial, nor have appellants demonstrated in this court how any of the questions prejudiced them. The party alleging error has the burden of showing that the error was prejudicial to his case. Cash v. K.C.I. Const., Inc., 95-1083 (La.App. 5th Cir.5/15/96), 675 So.2d 297, 301, writ denied, 96-1811 (La.10/25/96), 681 So.2d 369. Absent the necessary showing, this assignment of error is without merit.

COMMON ISSUE 14:
Whether the trial court erred in precluding defendants from using plaintiffs' pleadings in cross-examination.
As in several other common issues, the briefs suffer from a lack of specificity and a failure to cite to the record. Only Westinghouse attempted to brief this issue and so it should be considered abandoned as to the other appellants as per URCA 2-12.4.

COMMON ISSUE 15:
Whether the trial court erred in admitting post-1976 evidence of alleged dangerous environment at Avondale and in excluding evidence proffered by Avondale interests to rebut post-1976 hearsay evidence?
Avondale Interests argue that the trial court erred in allowing the introduction of evidence that was hearsay, unauthenticated, irrelevant, and prejudicial to them. The evidence in question was Avondale's safety record in the 1990s, complaint letters to OSHA from a "workers' safety committee" at Avondale regarding safety violations, OSHA citations to Avondale for safety violations in 1994 and 1995, and a newspaper article regarding safety at Avondale published in the Times-Picayune in 1994. This evidence was introduced during the cross-examination of Mr. Danny Joyce, a defense expert witness in industrial hygiene called by the Avondale Interests.[14]
The Avondale Interests argue that since they are statutorily immune for negligent conduct after 1976, this evidence was inadmissible, irrelevant, and prejudicial, besides being unauthenticated and hearsay. They also note that none of the objected-to evidence pertains in any way to Avondale's handling of asbestos, and they were not *76 allowed to properly rebut this evidence.[15]
Plaintiffs argue that the introduction of the evidence was proper impeachment because Mr. Joyce's testimony put Avondale's post-1976 safety record at issue. They also argue that the Executive Officers remained liable for intentional conduct after 1976, and thus the evidence was relevant. Plaintiffs further claim that Mr. Joyce authenticated all of the evidence, and that the newspaper article was authenticated under LSA-C.E. art. 902(6).

AUTHENTICITY
In his rebuttal testimony, we find that Mr. Joyce authenticated the OSHA citations from 1994 and 1995. A significant amount of his rebuttal testimony was devoted to explaining the nature of these citations and their outcome. Further, we find that the newspaper article was authenticated as per LSA-C.E. art. 902(6).

HEARSAY
Even though Mr. Joyce authenticated some of this evidence, another prerequisite to admissibility is that the evidence not be hearsay. Hearsay is generally inadmissible as evidence. La. C.E. art. 802. However, when an out-of-court statement is offered for a purpose other than to establish the truth of the assertion, the statement is not hearsay. State v. Zeno, 99-69 (La.App. 5th Cir.8/31/99), 742 So.2d 699.
Plaintiffs argue that the complaint letters, the newspaper article, and the OSHA citations were offered to impeach Mr. Joyce's credibility. However, this evidence does not directly impeach any statements made by Mr. Joyce regarding Avondale's safety record, working conditions, asbestos handling, etc. before 1976. Nor does this evidence impeach Mr. Joyce's credibility as an expert or his past experience at Avondale, as all of this evidence concerns events occurring at Avondale after Mr. Joyce left employment there: events of which he had no direct knowledge nor professional responsibility.
We conclude that at its introduction, the complaint letters, OSHA citations, and newspaper articles were hearsay, and the defendants' objections were proper.

RELEVANCE
Avondale Interests argue that this evidence was irrelevant and prejudicial to them, because it concerned events occurring after 1976, and because none of the evidence concerned the central issue of this litigation, which was Avondale's handling of asbestos. Plaintiffs argue that post-1976 evidence was relevant to establish intentional tortious conduct of the Avondale Executive Officers, for which they are not immune to prosecution under R.S. 23:1032 as amended.
The record establishes that the parties agreed, pre-trial, that these suits alleged negligent conduct and not intentional conduct from any time period. Thus, post 1976 evidence was clearly irrelevant and not at issue. The letters and citations are from 1992 or later, with most being from 1994 and 1995. Not only is this after 1976, it is also after 1991, which is when the witness Danny Joyce ended his employment with Avondale.
None of this evidence concerned Avondale's safety record in handling asbestos. Therefore, at best, this evidence was clearly irrelevant to any testimony of Mr. Joyce. Plaintiffs argue that the "door was opened" to post-1976 evidence during the testimony of Mr. Peter Territo. If in fact the defendants did open the door during *77 his testimony, the proper place for this evidence's introduction would have been during Mr. Territo's cross-examination, not Mr. Joyce's.

CONCLUSION
The introduction of this evidence concerning post-1976 non-asbestos safety complaints at Avondale was clear error because this evidence was both irrelevant and hearsay. It did not relate to pre-1976 events at Avondale nor Avondale's handling of asbestos. The evidence was clearly hearsay because it was offered to prove the truth of the post 1976 safety complaints and citations. The evidence was not proper, however, to impeach any of Mr. Joyce's testimony because none of Mr. Joyce's limited post-1976 direct testimony concerned Avondale's post-1976 safety record.
We find, however, that Mr. Joyce was allowed sufficient opportunity on redirect examination to explain the nature of this evidence, particularly the OSHA citations. Thus, the error was made harmless and is not reversible. Though the Executive Officers would have preferred to introduce the testimony of the OSHA officials who investigated the citations, Mr. Joyce's testimony was sufficient to explain the citations and how they were resolved. His redirect examination, as a whole, served to explain and diffuse much of this prejudicial, irrelevant, hearsay evidence.
Also, the jury was instructed by the court in the final jury charge, "In considering whether or not any of the Avondale employees sued by plaintiffs were negligent" to only consider what the Executive Officers knew "before October 1, 1976." This limiting instruction, coupled with Mr. Joyce's testimony on redirect, were sufficient to limit any prejudicial harm caused by the improperly introduced evidence.

COMMON ISSUE 16:
Whether the trial court failed to properly instruct the jury regarding applicable law? (Unreasonably dangerous per se and sophisticated user and purchaser)
Appellants argue that the trial court erred in instructing the jury that it could find the manufacturer defendants liable if the jury determined that their products were unreasonably dangerous per se as defined in the case of Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986). Appellants argue that in both Young v. Logue, 94-0585 (La.App. 4th Cir.5/16/95), 660 So.2d 32, and Asbestos v. Bordelon, Inc., 96-0525 (La.App. 4th Cir.10/21/98), 726 So.2d 926, the Fourth Circuit concluded that Halphen's unreasonably dangerous per se liability constituted a substantive change in Louisiana products liability law that could not be applied retroactively, because the plaintiffs testified that their initial significant exposures occurred before Halphen.

UNREASONABLY DANGEROUS PER SE
In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. LSA-C.C.P. art. 1792. The trial judge is not required to give the precise instructions submitted by either party. Fisher v. River Oaks, Ltd., 93-677 (La.App. 5th Cir.3/16/94), 635 So.2d 1209, 1213, writ denied, 94-0932 (La.6/3/94), 637 So.2d 503. Adequate jury instructions are those that fairly and reasonably point up the issues and that provide correct principles of law for the jury to apply to those issues. Fisher v. River Oaks, Ltd., supra. The adequacy of jury instructions must be determined in light of the instructions as a whole and the manifest error standard of review may not be ignored unless the instructions *78 were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts. Fisher v. River Oaks, Ltd., supra; Morgan v. ABC Manufacturer, 96-59 (La.App. 5th Cir.1/15/97), 694 So.2d 394, 397.
The law is clear that an appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.1983), writ denied, 434 So.2d 1097 (La.1983).

ANALYSIS
We find that the Louisiana Supreme Court did not create new substantive law in Halphen. The court in Halphen merely compiled and interpreted the law with regard to products liability in Louisiana at that time. Justice Dennis, the author of Halphen, held in Hulin v. Fibreboard Corporation, 178 F.3d 316 (5th Cir.1999), that Halphen applies retroactively. We find his language persuasive. The decisions of a court of last resort are not the law, but only the evidence of what the court thinks is the law.[16] The Supreme Court has held that unless a judicial decision specifies otherwise, it is given both retrospective and prospective effect.[17] A prospective-only application of judicial decisions is, in effect, legislating. Under Louisiana's Constitution, the power to make substantive laws is vested in the legislature. La. Const. Art. III sect. 1, Art. II sect. 1, 2.
Therefore, we find that the trial court properly instructed the jury of products liability law according to the Halphen decision.

SOPHISTICATED USER/PURCHASER
ACL argues that the trial court erred in refusing to include ACL's requested jury charges on the sophisticated purchaser and sophisticated user defenses. They argue that these instructions were important in their defense because ACL only mined and sold raw asbestos fiber, and it did not manufacture or produce any asbestos products. ACL contends that the other parties in the case were either sophisticated users or sophisticated purchasers of manufactured asbestos containing products.
ACL argues that the requested charges should have been given because they stated pertinent and applicable law that could have absolved them of liability, citing Gonzales v. Xerox Corp., 320 So.2d 163, 164 (La.1975). ACL points out that in Cimino v. Raymark Industries, Inc., 151 F.3d 297 (5th Cir.1998), ACL based its theory of defense on sophisticated purchaser, and was found free from liability. Under Davis v. Avondale Industries, Inc., 975 F.2d 169 (5th Cir.1992), ACL contends that a defendant is entitled to the submission of an appropriate instruction on its theory of defense.
Plaintiffs argue that the "unreasonably dangerous per se" charge was the applicable law to be given to the jury. Plaintiffs assert that the trial court concluded that no sophisticated user instruction would be given because the defendants presented no evidence that the plaintiffs were in fact sophisticated purchasers or users.
Plaintiffs point out that the Louisiana courts have consistently rejected the sophisticated user doctrine and have held *79 that the manufacturer has a duty to warn the user unless the user is aware of the danger or the danger is "open and obvious," citing Horne v. Liberty Furniture Co., 452 So.2d 204 (La.App. 5th Cir.1984); and Fincher v. Surrette, 365 So.2d 860 (La.App. 4th Cir.1978). Plaintiffs further allege that under Moore v. Safeway, Inc., 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831, 864, the jury's finding of products being unreasonably dangerous per se negates the relevance of the failure to give a sophisticated user charge.

LAW
The trial judge is not required to give the precise instructions submitted by either party. The trial judge must only give instructions that properly reflect the law applicable to the facts of a particular case. Fisher v. River Oaks, Ltd., supra at 1213; Jones v. Liberty Mut. Ins. Co., 568 So.2d 1091 (La.App. 5th Cir.1990). It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable to prevent counsel from arguing law that the trial judge deems inappropriate. LaFrance v. Bourgeois, 97-376 (La.App. 5th Cir.10/15/97), 701 So.2d 1026, 1028-9, citing Johnson v. Terrebonne Parish Sheriffs Office, 95-1180 (La.App. 1st Cir.2/23/96), 669 So.2d 577; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La. App. 1st Cir.3/11/94), 634 So.2d 466.

ANALYSIS
In Halphen v. Johns-Manville Sales Corp., supra the court held that there are four categories of unreasonably dangerous products, two of which are pertinent in this case: those that are unreasonably dangerous per se, and those with any danger inherent in normal use not known or obvious to the user of which the manufacturer has not adequately warned.
A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product. This theory considers the product's danger-infact, not whether the manufacturer perceived or could have perceived the danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Halphen at 114. If a jury finds that the product is unreasonably dangerous per se, then it is the product itself that has been evaluated, and the knowledge of the purchaser is irrelevant according to Halphen. In this case, the jury found that ACL's product was unreasonably dangerous per se.
The sophisticated user charge submitted and requested by ACL read:
Manufacturers and sellers are not liable for dangers known to the user. There is no duty to warn a user of a danger that is obvious or of a common knowledge. Neither is there a duty to warn a user, sometimes defined as a `sophisticated user,' who, through his familiarity with the product, is presumed to know of its dangers.
ACL points out that the sophisticated user defense was successfully asserted in Damond v. Avondale Industries, Inc., 98-1275 (La.App. 4th Cir.8/19/98), 718 So.2d 551. We find the Damond case distinguishable. In Damond the alleged defective product was sand, and the court found that "sand is not unreasonably dangerous per se," and nothing in the sand makes it unreasonably dangerous in its normal use. Sand may be an unreasonably dangerous product if there was a danger in its use in sandblasting that was not known or obvious. The court found that the danger created by airborne sand during sandblasting was obvious and known. In this case, invisible asbestos *80 fibers caused the plaintiffs' lung injuries. This danger was not known or obvious to the workers at Avondale and was a characteristic of the raw asbestos itself, and not the result of some product modification or use. Therefore, the trial court did not err in refusing to give the requested sophisticated user charge.
We find that the case of Cimino v. Raymark Industries, Inc., supra, cited by ACL, is also distinguishable and not controlling. The Federal Fifth Circuit, in holding that the supplier of raw asbestos to manufacturers owed no duty to warn users of the manufacturer's products, applied substantive law of Texas, not Louisiana, in determining what the Texas Supreme Court might conclude were the parties' respective duties. Cimino, 151 F.3d at 299.
We find that the Halphen charge, which included unreasonably dangerous per se and the ordinary user language, was the applicable law, and provided the correct principles of law for the jury to apply to the issues. We further hold that the trial court's omission of ACL's requested sophisticated user charge was not error considering that the dangers of raw, invisible asbestos fibers were not obvious or known to the plaintiffs in this case.
The court used the term "ordinary user" in its jury instruction, again relying on Halphen:
Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user.

Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 114, 115 (La.1986).
The Judge instructed the jury that there was no duty to warn of those risks that were obvious or known. Under Halphen, the court explained the different categories of unreasonably dangerous products recognized by most courts. The court held that whether the knowledge of the danger in a product is material, relevant, or admissible depends on the particular theory of recovery under which the plaintiff tries his case. If a jury finds that the product is unreasonably dangerous per se, then it is the product itself that is evaluated, and the knowledge of the purchaser is irrelevant. Under this theory, a charge concerning a "sophisticated user" or "ordinary user" is irrelevant and not warranted.
We find no merit in these arguments.

COMMON ISSUE 17:
Whether the trial court erred in refusing to allow certain jury charges and interrogatories related to the executive officer liability?

A. RULES OF LAW FOR EXECUTIVE OFFICERS LIABILITY

Avondale Executive Officers acknowledge that the trial court gave the basic charge with regard to executive officer liability from the case of Canter v. Koehring, Co., 283 So.2d 716 (La.1973). However, they argue that further explanation of the Canter charge according to Smith v. Dow Chemical, 92-883 (La.App. 1st Cir.3/28/94), 635 So.2d 325, should have been given. In Smith, the Louisiana First Circuit held that a plaintiff must do more than establish negligence in the abstract or the existence of an on-the-job injury to impose liability on the co-employee defendant. The Avondale defendants contend that Smith made clear that the jury may not combine the separate knowledge of the executives together to find liability for *81 any one of them, and that it was error not to instruct the jury on this language.
Avondale Executive Officers contend that the individual executive officer defendants were unaware of the risk of harm when workers were exposed to asbestos at the federally-approved level, citing as proof that in some cases, the Executive Officers defendants suffered the same injuries as plaintiffs.
The Louisiana Supreme Court, in Canter, laid out a four part test to determine executive officer liability. The applicable jury charge given by the trial judge was:
An employer, such as Avondale, owes a duty to its employees, such as plaintiffs, to provide a safe place within which to work. However, a corporation may delegate this duty to individuals in its employ, such as safety directors, plant managers, supervisors, and foremen. A person whom the company has delegated its duty to provide a safe place to work owes the company employees, such as plaintiffs, a duty to use due care not to injure them. That is, the safety personnel must not create or maintain any condition which will result in an undue risk of harm to others.
The law has established the following criteria for imposing individual liability:
1. The principal or employer owes a duty of care to the third person, which in this sense includes a co-employee, breach of which has caused the damage for which recovery is sought.
2. The duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal as contrasted with technical or vicarious fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances, whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others, as well as from the lack of ordinary care in discovering and avoiding such risk of harm, which is resulted from the breach of the duty.
4. With regard to the personal fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiffs damages.
In Asbestos v. Bordelon, Inc., supra, the Fourth Circuit held that there was no error in the Canter charge given to the jury.
We find no error in the trial court's instruction to the jury on executive officer liability pursuant to Canter. The jury was properly instructed concerning the four part test set forth in Canter. The trial court's instructions properly reflected the law applicable to the facts of this particular case.

B. COMPLIANCE WITH STATUTORY REGULATIONS

Avondale Interests allege that it was reversible error when the trial judge refused to charge the jury regarding consideration of compliance with statutory regulations by the Avondale Executive Officers. The record reflects that the jury was instructed with regard to applicable law and *82 statutory regulations. The trial court's jury charge mentioned governmental standards and government regulations, and instructed the jury that:
Compliance with government standards is but one element or item of proof of whether or not the product is defective.
* * * *
Louisiana courts have recognized that while statutory violations are not in and of themselves definitive of civil liability they must be guidelines for the court in determining standards of negligence by which civil liability is determined.
We find that this charge adequately instructed the jury concerning compliance with statutory regulations and how regulatory compliance should be considered when assessing negligence.

C. WHETHER THE CAUSE OF ACTION ACCRUED AFTER SEPTEMBER 30th, 1976.

The Avondale Executive Officers contend that it was reversible error when the trial judge refused to instruct the jury that the plaintiffs must have contracted a disease prior to 1976, and when the trial judge refused the jury interrogatory that stated:
Do you find by a preponderance of the evidence, that plaintiffs contracted an asbestos related disease after September 30th, 1976?
We have already addressed the issue of when a cause of action accrues in long latency cases in Common Issue 3, and need not repeat it here. However, the determination of when a cause of action accrues is a fact question. Since Avondale Executive Officers are immune from tort liability after October 1, 1976, the trial court erred in not allowing the jury to determine whether or not the plaintiffs were injured prior to 1976. The only reference to October 1, 1976 in the jury charges was an instruction by the judge that in considering whether or not any Avondale employees were negligent, "you should only consider whether or not they knew or had good reason to know that asbestos products as used at Avondale were hazardous to health before October 1, 1976."
The trial court should have given some limiting instruction or a jury interrogatory that would have allowed the jury to decide whether or not any injury occurred prior to October 1, 1976.
Due to this error, the appellate court must perform a de novo review on the issue and determine if each plaintiffs cause of action accrued before October 1, 1976. This detailed analysis will be performed when the court reviews each plaintiffs individual Assignments of Error. As to the seven plaintiffs addressed in this opinion, the record supports a finding that each incurred injuries prior to October 1976. This finding is based on each plaintiffs work history, which documented their repetitive exposure to asbestos prior to 1976, and the medical testimony concerning the effects of the exposure on each plaintiffs lungs.

COMMON ISSUE 18:
Whether, because of significant omissions and misstatements, the jury verdict form was misleading?
Appellant ACL adopted Westinghouse's argument that the jury verdict form was misleading and confused the jury. In support, appellants cite the following findings made by the jury, which they contend are incompatible with the basis of plaintiffs' claims and indicate the jury was confused:
1. That exposure to an appellant's asbestos product was a substantial contributing cause of plaintiffs' asbestos-related disease;

*83 2. That appellant was negligent;
3. That appellants' product was unreasonably dangerous per se;
4. That appellant had reasonably designed its product;
5. That appellant had not failed to warn of hazards associated with asbestos; and
6. That appellant had not committed any fraudulent misrepresentation or concealment.
Avondale asserts that certain jury interrogatories related to their position were omitted.
Appellants suggests that the jury's answers indicate that they found the mere presence of any amount of asbestos in its product rendered the manufacturer absolutely liable. This conclusion, says appellants, is due to the erroneous Halphen instruction and the Halphen "unreasonably dangerous per se" interrogatory.
The plaintiffs counter that the jury was not misled and that there was substantial evidence to support the finding that appellants' product was unreasonably dangerous per se.
The testimony, which established that dangerous levels of asbestos fibers were released when asbestos products were cut, coupled with the testimony that asbestos fibers remain in the air for extended period of time, and that ingestion of fibers causes a disease process that is cumulative and progressive, all warranted both the Halphen charge and a jury interrogatory. Since we have already rejected the reasoning of Young v. Logue, supra and determined that Halphen did not create substantive law and thus can be applied retroactively (see common issue 16), we are satisfied that no error resulted from giving that charge. Nor have appellants demonstrated how the charge and/or interrogatory confused the jury.
Finally, appellants advance the argument that the jury interrogatory, "Was the defendant's product unreasonably dangerous per se?" was legally inconsistent with other interrogatories. We disagree.
It is not necessarily inconsistent, under Halphen, to have instructions for both unreasonably dangerous per se and unreasonably dangerous in design and for failure to warn. The jury could have found both that the products were designed to perform as they were meant to perform, yet were unreasonably dangerous per se simply because they contained asbestos fibers that could be released into the air. Or, in other words, the product's design was not inherently dangerous, but it was the properties of the asbestos that made it so. This Assignment of Error lacks merit.

COMMON ISSUE 19:
Whether the trial court improperly calculated the credit allowed for the Johns-Manville settlement?
Appellant Avondale Interests argues that the trial court erred in calculating the credit allowed to the defendants for the Johns-Manville (hereinafter referred to as J-M) Settlement Trust.[18] The trial judge refused to assign J-M a virile share even though the jury found J-M liable to the plaintiffs. Defendants argue that under Louisiana pre-comparative fault law, because the jury found J-M liable to the plaintiffs, the trial court should have assigned J-M a virile share.
Plaintiffs assert that the trial court properly interpreted the trust language and applied Louisiana law to arrive at its *84 conclusion that defendants would receive a credit for the actual dollar amount when and if plaintiffs received any money from the trust, but J-M would not be assigned a virile share. The plaintiffs argue that the J-M Trust is not a "settlement" as per Louisiana law. Plaintiffs argue that the amount of plaintiffs award from the trust is determined by the trust, not by a jury verdict; therefore, there can be no true right of contribution between the trust and the defendants who have been found liable in this suit. Because the J-M settlement is not a true "settlement" under Louisiana law, and J-M is not a "released party," they argue that the trial court's "middle ground" solution is proper under the trust and Louisiana law.
Both sides quote the same specific language from the J-M Bankruptcy Trust Agreement in support of their positions.[19] The J-M Trust language designates how a settlement receipt should be credited depending on whether a states' laws are pro rata or pro tanto. The defendants claim that Louisiana is a "pro rata" state, and, as per the language of the trust agreement, J-M should have been assigned a virile share.[20] Quoting the same language, the trial court found that Louisiana is not a pro rata state as defined by the Trust, and that the law in effect at the time of the tortious exposures, which was pre-comparative fault, dictates the specific result reached by the trial court.

ANALYSIS
It is well settled that pre-comparative fault law applies to these claims. Cole v. Celotex, supra. Prior to the passage of the Louisiana Comparative Fault Law, this state divided fault between solidary obligors by virile shares. If one or more solidary obligor were insolvent, a plaintiff could collect the entire judgment from one solidary obligor, who would then have a right of contribution against the solidary obligors who had not discharged their obligations. LSA-C.C. art. 1806, and repealed LSA-C.C. arts. 2104 and 2105. The risk that a judgment debtor was insolvent was born by his co-debtors, not the judgment creditor. Harvey v. Travelers Ins. Co., 163 So.2d 915 (La.App. 3 Cir.1964), and cases cited therein. If a solidary obligor, solvent or insolvent, settled with the plaintiff for any amount, the other solidary obligors benefitted by a credit proportional to his virile share, not by the dollar amount he may have paid in settlement. Therefore, Louisiana is a pro rata state rather than a pro tanto state.
Plaintiffs cited the cases Findley v. Falise, 929 F.Supp. 1 (E.D.N.Y.1996) and Brewer v. Fibreboard Corporation, 127 Wash.2d 512, 901 P.2d 297 (1995), to support their position, and the trial court noted both in its Reasons for Judgment (notwithstanding the verdict). The Brewer court's analysis of Washington law shows, however, that Washington is a pro tanto state, and therefore this case is not applicable. Our analysis of the Findley case shows that the applicable Maryland statute provided only for a pro tanto reduction in liability in the absence of an express agreement to the contrary. Maryland law *85 is not similar to Louisiana virile share law, and therefore is also inapplicable.
The trial court found that Louisiana does not fit within the Trust's Section 3(c) definition of a pro rata state because of LSA-C.C. art. 1806. However, we find that article 1806 does not apply to solidary obligors who have created a settlement trust fund. We note that this is not a case where any plaintiff has depended upon Johns Manville's solvency. The Trust's immediate and persistent problems in funding settlements has been long known,[21] and since J-M was sued and included on the jury interrogatories, assigning J-M a virile share is correct under Louisiana law. If the jury found J-M liable it would form a basis for the plaintiffs to apply and recover something from the Trust.

CONCLUSION
Under pre-comparative fault law, Louisiana was a virile share (pro-rata) state. The trial court failed to assign J-M a virile share, and in doing so, erred. The total number of virile shares should be recalculated, as to any plaintiff to whom the jury found J-M liable, to include a virile share for J-M.

ACL COMMON ISSUES AND DISCOVERY SANCTIONS
ACL filed a Common Issue brief in which it ignored the characterization and number designation of common issues that it was instructed to follow in the Court's briefing schedule. ACL identifies 23 Common Issues, the bulk of which have already been dealt with by the Court in the Common Issues 1 through 19 discussion. ACL did identify some Common Issue Assignments of Error that are specific to its case. ACL in its appellant brief on the Group I plaintiffs restates its position with regard to these specific Assignments of Error, and the Court will now address those Assignments of Error.

DISCOVERY SANCTIONS
ACL mined and milled raw chrysotile asbestos fiber. ACL did not manufacture any asbestos containing products. Plaintiffs alleged ACL sold the raw fibers to various companies who incorporated these fibers in their manufactured products. Plaintiffs allege that while working at Avondale they were exposed to these products that contained asbestos fibers mined and sold by ACL.
Plaintiffs submitted numerous discovery requests directed to ACL. Portions of these requests were answered. However, many requests were not answered because ACL claimed that by answering the requests, they would violate the Quebec Business Concerns Records Act (QBCRA). ACL claims QBCRA prohibits the production of information from records that are within the Providence of Quebec. ACL refused to answer other requests because they were over broad or unduly burdensome.
Plaintiffs filed a Motion to Compel, which resulted in the trial court's issuance of a discovery sanction that provided: (1) the plaintiffs were entitled to a presumption that each plaintiff had been exposed to asbestos mined, sold, or supplied by ACL; (2) ACL was prohibited from introducing any evidence to the contrary; and (3) ACL's defenses were limited to medical issues, whether ACL's conduct constituted negligence, or whether ACL could be held liable under the principles of strict products liability.
*86 ACL has listed three Assignments of Error related to the discovery sanction imposed by the trial court against it. On appeal, ACL contends that the trial court erred in entering this sanction and prohibiting ACL from putting forth all its defenses, that the trial court erred in entering an excessive discovery sanction, and that plaintiffs were not prejudiced by ACL's failure to comply with discovery.
The plaintiffs point out that ACL took an Emergency Writ (95-C-722) to this court when this discovery sanction was levied against it. This court denied the writ, finding the imposition of sanctions was within the trial court's discretion, and further that ACL "has an adequate remedy on appeal since it should be permitted to proffer the excluded evidence."
LSA-C.C.P. art. 1471 provides for sanctions when a party fails to comply with an order compelling discovery. Sanctions allowed under article 1471 include:
(1) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.
(2) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence.
Much discretion is given to the trial court in selecting appropriate sanctions for failure to comply with discovery orders. Hurtle v. State Farm Mutual Auto Insurance, 94-870 (La.App. 3rd Cir.3/1/95), 651 So.2d 418. The appellate court must find a clear abuse of discretion to overturn a judgment granting sanctions. Id.
In this case we find that the discovery sanctions were imposed without sufficient procedural due process safeguarding. Jurisprudence suggests the trial court should have issued an order requiring discovery responses, including an Order that the failure to do so would result in a named sanction, i.e. irrebuttable presumption. We hold that the sanction was excessive in this case; however, ACL had an adequate remedy on appeal since this court, in response to the writ filed concerning the discovery sanction, instructed ACL to proffer the excluded evidence concerning whether or not ACL supplied raw asbestos that was incorporated into products that caused injury to Avondale employees.
LSA C.C.P. Art. 1636 states in part:
A. When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.
ACL did not proffer any evidence that its asbestos fibers were not incorporated into any of the products used at Avondale. The purpose of a proffer was discussed in McLean v. Hunter, 495 So.2d 1298, 1305 (La.1986): "Without a proffer, appellate courts have no way of ascertaining the nature of the excluded testimony."
We hold that ACL's contention that to proffer any evidence would be overly burdensome is without merit. ACL could have easily identified the manufacturers it sold raw asbestos to or, in the alternative, proffered testimony that it did not sell asbestos fiber to the asbestos product manufacturers who were defendants in this case. We decline to reverse the outcome of this seven month jury trial based on ACL's argument of inappropriate discovery sanctions when ACL chose not *87 to introduce that evidence in the form of a proffer.

ACL ASSIGNMENT OF ERROR I
The trial court erred in refusing to include jury charges for sophisticated purchasers and sophisticated users.
See discussion of Common Issue No. 16.

ACL ASSIGNMENT OF ERROR II
The trier of fact erred in finding ACL negligent in the absence of evidence thereof.

ACL ASSIGNMENT OF ERROR III
The trier of fact erred in holding that plaintiffs proved their respective exposures were of sufficient regularity, proximity and frequency to meet their burden of proof for causation.
ACL's Assignments of Errors II and III both address negligence and causation; hence, we will address these two errors together.
Plaintiffs alleged that ACL sold raw asbestos fibers to various companies who incorporated these fibers in their manufactured products. Plaintiffs argue that while working at Avondale they were exposed to these products that contained asbestos fibers mined and sold by ACL.
ACL contends that the plaintiffs failed to establish the first element for a finding of negligence: causation. ACL argues that the plaintiffs did not set forth any evidence that the raw asbestos mined by ACL caused their injuries. ACL further alleges that the trial court erred in holding that the plaintiffs met their burden of proving their respective exposures to ACL's product under Louisiana negligence/product liability law. Plaintiffs argue that the asbestos was unreasonably dangerous per se and thus ACL was liable. Plaintiffs contend that the discovery sanction created an irrebuttable presumption that plaintiffs were exposed to ACL asbestos, and therefore, proved cause-in-fact.

ANALYSIS
To determine whether a defendant is negligent, the case usually requires proof of five separate elements: (1) duty; (2) breach of duty; (3) cause in fact; (4) scope of liability or scope of protection; and (5) damages. Porteous v. St. Ann's Cafe & Deli, 97-0837 (La.5/29/98), 713 So.2d 454. In this case, ACL alleges that the plaintiffs failed to prove the third element, that their product was a cause in fact of the plaintiffs' injuries. Specifically, ACL alleges that each individual plaintiff failed to prove that their respective exposures to ACL's asbestos product were of sufficient regularity, proximity, and frequency to carry their burden of proof.
A method for determining cause-in-fact, which is generally used when multiple causes are present, is the "substantial factor" test. Under this test, cause-in-fact is found to exist when the defendant's conduct was a "substantial factor" in bringing about plaintiffs harm. Roberts v. Benoit, 605 So.2d 1032, 1042 (La.1991). The substantial factor test in this case was met due to the discovery sanction imposed by the trial court. The sanction explicitly stated that once a plaintiff proved he was exposed to asbestos, there was a presumption that he had been exposed to asbestos mined, sold or supplied by ACL. In light of this sanction, there is substantial evidence in the record to allow a jury to reasonably conclude that plaintiffs were exposed to asbestos that presumptively was supplied by ACL, and therefore, ample evidence to allow the jury to find ACL's asbestos substantially contributed to their injuries.

ACL ASSIGNMENT OF ERROR IV
The trier of fact erred in finding ACL liable for fraud in the absence of proof thereof.
By this Assignment of Error, ACL argues that plaintiffs failed to plead any *88 allegations of fraud by ACL with particularity. ACL also urges that plaintiffs did not meet procedural requirements because they failed to allege that ACL committed fraud or allege that ACL was a member of any of the asbestos trade organizations to which the allegations were specifically directed. It is further alleged that fraud was not proven by a preponderance of the evidence.
Plaintiffs counter with references to evidence documenting efforts by Quebec Asbestos Manufacturer's Association (QAMA), the asbestos industry organization of which ACL was a member, to suppress information about the connection between lung disease and asbestos.

ANALYSIS
Under LSA-C.C. art. 1953, fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. According to LSA-C.C.P. art. 856, when pleading fraud, the circumstances constituting fraud shall be alleged with particularity.
In this case, plaintiffs specifically plead that members of the trade association QAMA committed fraud and conspired among themselves and with other asbestos manufacturers, distributors, and trade organizations to injure the plaintiffs. ACL was added as a defendant in this matter by the "Supplemental and Amendment to Petition" filed on November 17, 1994. In the amended petition, paragraphs 10 through 25 from the previously filed petitions were incorporated by reference against ACL. Paragraphs 21 through 25, which allege fraud, placed ACL on notice of the fraud allegations.
There was ample evidence presented at trial to support the allegations that ACL was a participating member of QAMA and conspired to commit fraud. Minutes of a meeting of QAMA held on March 28th and 29th, 1968, were introduced into evidence as Plaintiffs' Exhibit-339. The document stated that the asbestos mining companies had known of the dangers of asbestos since 1918, and that it could cause fibrosis of the lung. It also stated that QAMA had a suspicion that asbestos could cause cancer since 1935. The document lists as one of the persons present M.P. Carson, a representative for ACL.
Dr. Herbert K. Abrams, an expert in preventive medicine, public health, and occupational medicine called by the plaintiffs, testified that ACL as a member of QAMA plotted the suppression of a 1947 study (P-38), showing 20% of workers exposed to asbestos levels below the then federal standard would likely die. The association published a watered down version (P-39) of the study, which claimed that workers exposed to asbestos did not contract lung cancer more than other people did.
The actionable element in a claim for fraud is not the conspiracy itself, but rather the tort that the conspirators agree to perpetrate, and which they actually commit in whole or in part. In order to recover under this theory of liability, a plaintiff must prove that an agreement existed to commit an illegal or tortious act, which resulted in the plaintiff's injury. Aranyosi v. Delchamps, Inc., 98-1325 (La. App. 1st Cir.6/25/99), 739 So.2d 911 (some citations omitted).
We hold that the pleadings placed ACL on notice of the fraud claim against it and that there is evidence to support the jury's conclusion that ACL committed fraud by participating in the suppression of the truth of the dangers of asbestos. Evidence exists in the record establishing *89 that ACL was a participating member of QAMA, and that QAMA supported the suppression of medical studies that indicated the dangers of asbestos fibers. Therefore, the jury could reasonably conclude that ACL's conduct was fraudulent.

THE CAUSATION PROBLEM IN ASBESTOS LITIGATION[22]
Asbestos litigation presents unique legal problems.
`Asbestos' is the name given to a family of hydrated silicate minerals which occur naturally as masses of fibers with the unique properties of relative indestructibility and high resistance to fire. These properties combine to make asbestos an invaluable ingredient in a variety of products used to protect human life. The heat-resistant properties and fibrous structure of asbestos make it extremely desirable as a fireproofing, insulating, and friction-resistant material. These unique properties make it a valuable ingredient in such products as brake shoes on automobiles, fireproof clothing, fire-resistant wallboard and cement, and coverings for pipes and electrical wiring. See U.S. Dep't of Health Educ., and Welfare Publ. L. No. 78-1594.
Masses of asbestos fibers, when disturbed in any manner, have a tendency to break easily into tiny dust particles which become suspended in the air. Extended periods of ingestion and inhalation of these particles have recently been linked to such debilitating diseases as asbestosis, bronchogenic carcinoma, and mesothelioma. Each of these diseases has a documented latency period of twenty to forty years after the initial exposure to asbestos. This latency period is explained by the fact that asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and apparently irreversible. Even if no additional fibers are inhaled, tissue damage may continue undetected for decades. Furthermore, the effect of the disease is cumulative because each exposure to asbestos dust can result in additional tissue damage. See generally Comment, Asbestos Litigation: The Dust Has Yet To Settle, 7 FORDHAM URB. LJ. 55, 63 (1978).
A major problem in asbestos litigation has been the inherent difficulty in identifying the manufacturer of the particular product that causes the plaintiffs injuries. Asbestos plaintiffs generally have been exposed to a wide variety of products containing asbestos. The probability that these plaintiffs were actually harmed by any particular asbestos product is a function of the percentage of asbestos in each product and the tendency of the asbestos to free itself from that product. The method in which a product is used or applied plays an important role in determining the propensity of that product to release asbestos fibers. Asbestos bonded in a finished product does not present significant health risks unless the product is disturbed in such a way as to free fibers in the air. On the other hand, sprayed asbestos insulation, which has a very high propensity to release asbestos dust, is extremely dangerous to health. Medical studies on asbestos exposure indicate that the diseases linked to asbestos inhalation increase in severity in a direct relationship to the length of exposure to asbestos dust.
To prevail, a plaintiff in an asbestos case must show, by a preponderance *90 of the evidence, that he was exposed to asbestos from the defendants' products, and that he received an injury that was substantially caused by that exposure. When multiple causes of injury are present, a defendant's conduct is a cause in fact if it is a substantial factor generating plaintiffs harm. Quick v. Murphy Oil Co., 93-2267 (La.App. 4th Cir.9/20/94), 643 So.2d 1291.
There can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature. A plaintiff seeking to recover under either negligence or strict liability theories must prove that the negligent act or defect complained of was a cause-in-fact of the injury. Davis v. State Farm Ins. Co., 558 So.2d 636 (La.App. 1st Cir.1990).
In Quick v. Murphy Oil Co., the court found that:
When evaluating liability in an asbestos claim, we apply traditional theories of tort liability (for example, negligence and products liability) which require proof of causation. See Cole v. Celotex Corp., 599 So.2d 1058 (La.1992); Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986); Thompson v. Johns-Manville Sales Corp., 714 F.2d 581 (5th Cir.1983), cert. den. 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984). Asbestos cases typically involve multiple defendants and courts have analyzed the cases under concurrent causation, a doctrine which "proceeds from the assumption that more than one defendant substantially contributed to the plaintiffs injury." 210 E. 86th Street Corp. v. Combustion Engineering, Inc., 821 F.Supp. 125, 150 (S.D.N.Y.1993).
* * * *
In Dixie Drive It Yourself System v. American Beverage Co., supra, the Supreme Court stated that "conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." Id., [242 La. 471,] 137 So.2d [298,] at 302 [(1962)]. The court stated that negligent conduct is a substantial factor if the harm would not have occurred without the conduct, i.e., but for defendant's conduct, plaintiff would not have sustained injury. The court thereby equated the two concepts of substantial factor and necessary antecedent. Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 373 (1970).
* * * *
The Louisiana Supreme Court recently stated that cause in fact is usually a "but for" inquiry which tests whether the harm would not have occurred but for the defendant's substandard conduct, and the substantial factor inquiry is an alternative method of analysis used when two or more combined causes are present. [cites omitted]. The substantial factor inquiry is applicable to this case because two or more causes are present.
Quick makes clear that a plaintiffs burden of proof against multiple defendants in a long-latency case is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant's product to the plaintiffs injury. Thus, in an asbestos case, "the claimant must show that he had significant exposure to the product complained of to the extent that it was a substantial factor in bringing about his injury." Asbestos v. Bordelon, Inc., supra at 948.[23]
*91 We are satisfied that application of the above principles is appropriate in the instant cases and our review will be guided accordingly. Thus, we will examine the evidence relative to each plaintiff and determine if it was sufficient to support the jury's determination of causation.

JNOV ASSIGNMENT OF ERROR
Each appellant assigns as error the trial court's granting of JNOVs in two respects: 1) the trial court's raising the jury's determination of the plaintiffs' damage awards, and 2) the trial court's overturning the jury's findings of liability with respect to nine settling parties.

STANDARD FOR JNOV
In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991), the court set forth the law regulating this procedure as follows:
In Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), we set forth the criteria to be used in determining when a JNOV is proper. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
See also Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); Maltby v. Lyttle, 99-1143 (La.App. 5th Cir.2/29/00), 758 So.2d 875.
This strict standard for granting a JNOV was recently reaffirmed by the Supreme Court in Davis v. Wal-Mart, Inc., XXXX-XXXX (La.11/28/00), 774 So.2d 84.

JNOV OVERTURNING LIABILITY AS TO NINE SETTLING PARTIES[24]
Appellants argue that the trial judge erred in granting JNOV in favor of *92 nine settling defendants[25] (Anchor Packing, Armstrong World Industries, Babcock & Wilcox, Combustion Engineering, Flexitallic, Garlock, Rapid American, Rock Wool Manufacturing, and Uniroyal), removing them from the virile share calculation of plaintiffs' damage awards.[26] In so doing, the trial court found:
This Court finds no evidence was introduced by defendants on the danger-in-fact or the utility of any of these nonparties' products or whether these nonparties were in fact the manufacturers of the particular products. Defendants did not introduce any evidence whether these products contained asbestos, whether the product produced dust in normal use, and/or what type of asbestos fibers were used. The defendants have not directed this court to any evidence proving fault by these nonparties.
The only evidence presented at trial regarding these nonparties or their products was testimony by some plaintiffs that these products were used at Avondale Shipyards and that they were believed to contain asbestos.
This is not sufficient evidence to establish strict liability under the unreasonably dangerous per se theory.[27]
As we stated above (in the Causation section), the first element of proof under either negligence or products liability is causation, and with multiple defendants, this inquiry is directed by the "but for" and "substantial factor" tests found in Quick v. Murphy Oil, supra. Reviewing the evidence in the record with these standards in mind, we agree with the appellants that as to four parties, Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool, the "blanket" JNOV was improper, as the record contains evidence that each product was used at Avondale and contained asbestos that could have contributed to the plaintiffs' dust exposure. The trial judge was legally incorrect when he made the determination that no reasonable mind could have found that these four manufacturers could be liable to plaintiffs for their injuries.
Many plaintiffs testified specifically that Babcock & Wilcox boilers were used on vessels at Avondale. They contained asbestos and asbestos cement, both of which were released into the environment when the boilers were installed and tested. Plaintiffs testified specifically that Combustion Engineering boilers were used at Avondale. They contained asbestos and asbestos cement similar to the Babcock & Wilcox boilers. Many plaintiffs in various occupations worked in the engine rooms in proximity to these products as the boilers were installed and tested.
Rapid American (Philip Carey before 1966) manufactured, among other products, Careytemp, an asbestos-containing pipe covering similar to Kaylo. Several plaintiffs identified Careytemp as used at Avondale. Burnett "Frenchy" Bordelon, head of the insulation shop at Avondale, identified it, in his deposition, as an insulation product used at Avondale. One other plaintiff identified a Rapid American asbestos cement used at Avondale. The record is replete with references that asbestos *93 pipe insulation created large amounts of asbestos dust during its cutting, installation, and also during repairs and removal. Several plaintiffs testified that pipe insulation often needed to be removed and/or repaired during the construction of new vessels as pipe welds were tested, for example, and that this activity created clouds of dust. Rock Wool manufactured insulation and Delta Made One Shot asbestos cement used at Avondale. Many plaintiffs, as well as Peter Territo and Danny Joyce, testified that One Shot was used at Avondale, and in fact it was described as the most commonly used asbestos cement there. Testimony established that One Shot contained asbestos and created copious amounts of dust when mixed with water. The dried cement also released large amounts of dust when it was ripped off the pipes by various trades of workers in the course of their duties (as, for instance, when pipe leaks were identified and repaired, or when insulation was replaced), which was frequently described by witnesses.
The evidence shows, however, that each plaintiff was not necessarily exposed to each of these four manufacturers' products. As noted previously, in asbestos cases, the term "exposure" refers to inhalation of asbestos fibers into the lungs. Asbestos v. Bordelon, Inc., supra. So although we find that the JNOVs in their favor were incorrect, it does not necessarily follow that these four manufacturers are liable to each plaintiff. Accordingly, we will consider each settling defendant's liability vis á vis each individual plaintiff, and alter the individual virile shares accordingly.
Regarding the products of Anchor Packing, Armstrong World Industries, Flexitallic, Garlock, and Uniroyal, evidence is completely lacking that they contributed to the plaintiffs' injuries. The trial judge's grant of JNOV in favor of these five manufacturers was correct. Though these products were identified by various witnesses, that evidence merely established their physical presence at Avondale, which is insufficient evidence to support the jury's findings that the manufacturers are liable to plaintiffs.
Only a few witnesses identified Anchor Packing products, and there was no testimony, expert or factual, about Anchor's products' properties or propensity to emit asbestos dust. Likewise, only five witnesses mentioned Armstrong: three identified Armstrong as the maker of asbestos tiles and gaskets that were used at Avondale, and two others testified specifically that they did not recall Armstrong products at Avondale. There was no testimony, expert or factual, about the physical properties of Armstrong products, their uses, or their propensity to emit asbestos dust.
Flexitallic and Garlock are identified by several plaintiffs as manufacturers of gaskets that were used at Avondale. But most plaintiffs who identified the gaskets said merely that they "remembered [Flexitallic, Garlock] them" or they "worked around" gaskets. There was no testimony to establish that the gaskets were used in their presence in a way to cause the emission of dust. The only expert evidence about any gaskets was supplied by Clayton Jewett, the representative of Garlock who described his gaskets' physical properties, asbestos content, and uses, and who testified that Garlock gaskets' chemical composition made them highly unlikely to produce significant amounts of dust.[28] He *94 described the manufacturing process of a compressed asbestos gasket. There was testimony that most of the gaskets were pre-cut. Only two of the 129 plaintiffs testified that they had to cut and/or remove gaskets and this activity created dust. Their testimony failed to establish which of the at least four[29] gasket manufacturers' gaskets produced this dust.
Uniroyal made asbestos cloth, gaskets, and cement material. Only three of the one hundred twenty-nine plaintiffs testified that they saw Uniroyal products, primarily asbestos cloth, at Avondale. However, only one witness, Charles Gautreaux, testified that cutting the asbestos cloth released dust. He described this dust as being 1000 times less than the dust produced when pipe insulation was cut. There is testimony that the asbestos blankets used by welders for fire protection caused dust to fly into the air when shook out, but this does not establish that the released dust was part of the blanket. The evidence establishes that this was most likely a redistribution of the dust already in the immediate environment. Likewise, there was testimony by one plaintiff that he saw a bag of Uniroyal cement material, but there was no evidence that this cement contained asbestos or that it was used in significant amounts.
Accordingly, the JNOV granted in favor of Anchor Packing, Armstrong, Flexitallic, Garlock, and Uniroyal is affirmed. The JNOVs granted in favor of Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool will be reviewed by this court on a plaintiff specific basis to determine whether the trial court's JNOVs were supported by the evidence. Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool Manufacturing will remain in the virile share calculation of those plaintiffs whose work histories show that they were exposed to significant asbestos dust from those manufacturers' asbestos-containing products.
Next, we review seven individual plaintiffs' JNOV judgments, both as to the quantum and as to whether the evidence supports the jury's finding that some or all of the nine settling parties are liable to the individual plaintiffs.

JNOVs ON QUANTUM
The appellants argue that the trial court erred in raising the plaintiffs' individual damage awards. They argue that the trial court violated the legal standards in granting the JNOVs on quantum. The trial court is required to follow the same legal standards in considering a JNOV on quantum as the court must follow in considering JNOVs on other issues.
The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), supra, i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under *95 the constraints of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), supra.

Mendoza v. Mashburn, 99-499 (La.App. 5th Cir.11/10/99), 747 So.2d 1159.
JNOV differs from a motion for additur; the non-moving party must consent to the additur. See LSA-C.C.P. art. 1814. This also differs from a grant of a motion for new trial, which employs a less stringent standard. State Dept. of Transp. & Development v. Scramuzza, 95-786 (La.App. 5th Cir.4/30/96), 673 So.2d 1249.[30]
The jury heard the testimony and saw reports from the many doctors who examined or interpreted medical tests concerning the 129 individual plaintiffs. The expert medical testimony of the plaintiffs' doctors and the defendants' doctors differed widely in diagnostic criteria, standards for testing, and ultimate diagnoses. It is important to note that not all of the doctors for either side examined all of the plaintiffs. To aid our resolution of the individual quantum awards, we will first review the general testimony of each doctor, plaintiff and defendant, who testified regarding these seven plaintiffs, and then will review each plaintiff specifically.
Dr. Larry Mitchell of Pulmonary Advisory Services examined most of the plaintiffs in Pascagoula, Mississippi, in 1991. He did not testify and his reports were not entered into evidence, but several plaintiff doctors relied upon those reports and based their diagnoses, wholly or partly, upon their interpretations of Dr. Mitchell's reports. Dr. Mitchell was not a board certified lung specialist.
Dr. Gaeton Lorino testified for the plaintiffs. He was a pulmonologist, specializing in the treatment and diagnosis of lung diseases, who practiced in Mobile, Alabama. Dr. Lorino examined 27 plaintiffs. He gave them a questionnaire, chest x-rays, and pulmonary function tests. Dr. Lorino said that 25 out of the 27 plaintiffs had asbestosis, and the other 2 had pleural disease.
Dr. Dominic Gaziano, who testified for the plaintiffs, was board certified in internal medicine, pulmonary disease, and critical care medicine. He practiced in Charleston, West Virginia. Dr. Gaziano reviewed the x-rays and pulmonary function tests of 34 plaintiffs, but did not examine them all personally, and diagnosed them all with asbestos-related disease. He relied upon the x-rays and reports generated by Dr. Mitchell of Pulmonary Advisory Services. Dr. Gaziano testified that not everyone exposed to asbestos will get an asbestos-related disease. Asbestosis is a dose-related disease. With heavy exposures for long time periods, he opined that almost all get asbestosis.
Dr. Anthony Casolaro testified for the plaintiffs. He was accepted as an expert in lung disease and pulmonology. He practiced in Arlington, Virginia. About ninety percent of the 50 or 60 plaintiffs that he examined he diagnosed with asbestosis. To diagnose asbestosis, Dr. Casolaro explained that one needs a history of exposure and latency, a history of symptoms, chest x-ray changes, and pulmonary function tests. Dr. Casolaro was of the opinion that people with asbestosis are at an increased risk of cancer.
Dr. Stephen Zimmet testified for the plaintiffs. He was board certified in internal medicine. He was medical director of respiratory services at Arlington Hospital, affiliated with Georgetown University, and was a clinical associate professor of medicine *96 at Georgetown and a consultant with Harvard as pulmonologist. He came to Louisiana with Dr. Casolaro. Of 30 plaintiffs he saw, he diagnosed 25 with asbestosis. Virtually all patients he had seen with asbestosis had been in connection with litigation. To diagnose asbestosis, he looked for occupational or associated exposure, x-rays, pulmonary functions, and physical examinations.
Dr. Zimmet stated that not every person exposed to asbestos will develop asbestosis. There is a dose-response relationship, but there is also an individual sensitivity or individual responsiveness. Dr. Zimmet testified that shipyard welders and other workers who spend a good portion of time in close proximity to pipefitters are at a significantly increased risk for asbestosis from a statistical standpoint. He agreed that one cannot predict which person will have progression to asbestosis and which will not.
Dr. Ewing W. Cook testified for the defendants. He was an associate professor of medicine at the LSU School of Medicine and practiced at Baptist Hospital (now Memorial Medical Center) in New Orleans. He practiced in the areas of internal medicine and pulmonary medicine. Medical/legal cases were a minor part of his practice, perhaps five percent. He examined 19 plaintiffs, and found that ten had no effects of asbestos exposure whatsoever. The remaining nine plaintiffs had some pleural changes associated with asbestos exposure, but none had asbestosis, and he felt that none of them would progress to asbestosis. His examination included development of exposure history, history of any other medical problems, a physical examination, pulmonary function studies, and chest x-rays.
Dr. W. Brooks Emory, an expert in pulmonary medicine, testified for the defendants. Dr. Emory was the head of the Pulmonary Medicine Department at Ochsner Medical Center. To determine whether a person had asbestosis, he used the American Thoracic Society criteria. Dr. Emory concluded that the 44 plaintiffs he examined did not have lung function impairment due to asbestos exposure. He said that the general condition of these 44 men was poor; some had arteriolosclerosis and heart disease, six already had had open heart surgery, some were obese, and all them were overweight. Also, more than 30 of them were smokers or exsmokers, so they had some propensity for health problems independent of asbestos.
Dr. Thomas Grimstad testified for the defendants. He was an internist at West Jefferson Hospital; his practice was primarily pulmonary. Five percent or less of his work was medical/legal. He saw a great deal of asbestos-related diseases in his practice. He examined 16 of the plaintiffs. He interviewed them, examined them, did chest x-rays and pulmonary function studies, and rendered reports. He found that ten of the sixteen plaintiffs had no asbestos effects.
Dr. Grimstad testified that not everyone exposed to asbestos will get an asbestos-related disease, not even the majority, in his experience. Pleural changes and plaques are a reflection of exposure to asbestos, but are not a disease in and of themselves. Most pleural plaques do not cause any problems and alone, do not pose a higher risk of cancer, but might in combination with asbestosis.
Dr. Eugene Rosenberg testified for the defendants. Dr. Rosenberg was a pulmonologist. He was a graduate of Tulane Medical School. He was board certified in both internal medicine and pulmonary diseases and had been in practice at West Jefferson Medical Center since 1979. Dr. Rosenberg evaluated twenty-six of the plaintiffs and prepared reports on them. *97 He collected a thorough medical history with regard to exposure, past medical history, medications, allergies, surgeries, social history, smoking history, and family history, and he did a head-to-toe physical examination, including vital signs and x-rays. He found that very few fit the occupational exposure profile, and very few had lung scarring on x-ray.
Dr. Rosenberg testified that there were a couple of cases where he could not rule asbestosis in or out, because the only sign was a reduction in diffusion capacity. Of all the people he saw, he was not concerned about any of them developing long term problems with disability based upon progression of their disease. Everyone he saw had very, very mild effects, they had been away from the exposure for a long time, and were unlikely to progress further. Dr. Rosenberg explained that pleural plaquing reflects a history of exposure, but did not necessarily mean that the patient had a lung tissue disease and it did not mean that the patient would develop pleural complications.
Dr. Robert Jones, an expert in internal and pulmonary medicine, testified for the defendants. In 1969-70, he participated in a study at the Johns-Manville and National Gypsum plants in the New Orleans area that involved about 900 workers who made asbestos products. He testified that not everyone who is exposed to asbestos develops asbestosis.
Dr. Jones examined 24 plaintiffs. He diagnosed six individuals with normal x-rays, normal lung function tests, and no asbestos-related diagnosis. He found that eleven plaintiffs had some x-ray abnormalities but none related to asbestos, and no asbestosis, pleural plaques or pleural thickening. He found that 5 more plaintiffs had pleural plaques, but felt that none of them would progress. Dr. Jones disagreed with all the plaintiffs' doctors regarding the diagnosis of all these 24 plaintiffs. Dr. Jones believed that most asbestos-related disease claims are specious because they are manufactured for the purpose of litigation. He stated that a lot of the claims in this case had been fabricated specifically to bring to court and to enrich attorneys.
Dr. David Hunter testified for the defendants. Dr. Hunter was certified as an expert in radiology and specifically in radiologic interpretation of dust diseases, including asbestos-related diseases. Through Dr. Grimstad and Dr. Rosenberg, he reviewed x-rays of 42 plaintiffs. Of the 42 he examined, he found zero percent to have asbestosis.
It is apparent, from reading the diagnostic opinions of the expert doctors who examined the plaintiffs, that the jury heard conflicting and sometimes opposing expert medical opinions about these plaintiffs' diagnoses. Juries are not bound by expert testimony; rather, expert testimony must be weighed just as any other evidence. The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. Asbestos v. Bordelon, Inc., supra. The jury's damage awards in this case reflect the widely opposing diagnoses they heard from the experts. It is not unreasonable, based on the evidence that they heard, for the jury to have concluded that the asbestos-related effects these plaintiffs suffered were, in many cases, very mild.
The Fourth Circuit in Asbestos v. Bordelon, Inc., supra, faced a similar scenario when it reviewed a jury's findings that were based upon testimonies of several expert medical witnesses. That court maintained, as we do here, that it was up to the jury to determine the credibility, demeanor, and weight of the testimony of *98 the various experts. Reasonable rejection by the trier of fact of one physician's testimony for the testimony of another physician is permissible. Asbestos v. Bordelon, Inc. at 973. Our review of the expert medical testimony shows that the jury's damage determinations were not unreasonable.
The trial court used the valuations in Atkinson v. Celotex, supra, to raise the jury's damage awards. The lowest award in Atkinson was $20,000.00. It is important to our consideration that in Atkinson on appeal, the plaintiffs argued that the low jury awards represented an abuse of discretion. This argument was rejected. The jury in Atkinson, as in this case, was presented with conflicting medical evidence regarding alleged asbestos injuries. The Third Circuit found no abuse of the jury's discretion and affirmed the quantum awards stating:
The differing medical evidence concerning the nature of and correlations among pleural disease, asbestosis, and cancer was irreconcilable and, we think, equally plausible. In such a circumstance, we must abide by the rule of appellate review articulated in Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991), which states that where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong.
Most of the plaintiffs in Atkinson had visible pleural plaques on their lungs found by both plaintiff and defense doctors, and additionally suffered from other symptoms. Our review of the plaintiffs in this case shows that the medical experts disagreed about the objective x-ray evidence of asbestos exposure, disagreed about the result of many of plaintiffs' respiratory tests, and universally disagreed regarding asbestosis diagnosis. Atkinson held that if two permissible views of the evidence exists, the fact finder can choose between them. A jury verdict that takes part of one expert's view and part of a conflicting expert's view, and compromises those views to arrive at its factual finding is not unreasonable. The finder of fact is required to assess the credibility of both expert and lay witnesses to determine the most credible evidence. The fact-finder need not accept all of the testimony of any witness as true, and may accept or believe as true only a part or parts of a witness's testimony. Holmes v. Southeastern Fidelity Ins. Co., 422 So.2d 1200 (La.App. 1st Cir.1982), writ denied 429 So.2d 133 (La.1983).
In this case, the jury awards ranged from $800.00 to over $70,000.00 for those workers who did not contract cancer. We found only three reported cases in Louisiana that address quantum awards to plaintiffs who suffered non-cancer asbestos injuries: Asbestos v. Bordelon, Inc., supra, Atkinson v. Celotex, supra, and Lilley v. Board of Supervisors of Louisiana State University, 98-1277 (La.App. 3rd Cir.3/24/99), 735 So.2d 696. All cases deal with multiple plaintiffs. In Atkinson the damage award range varied from $20,000.00 to $40,000.00. In Bordelon, the quantum range varied from $100,000.00 to $375,000.00, and in Lilley, the plaintiffs were awarded compensatory damages for fear of cancer ranging from $15,000.00 to $30,000.00.
The Jury Verdict Research Series provides some assistance in evaluating the reasonableness of this jury's quantum award by allowing us to compare their awards with jury verdict results from around the nation. The publication states that the verdict range for asbestosis is *99 $5,000.00-$15,600,000.00.[31] A case similar to the case at bar, Srite v. Owens-Illinois, 870 S.W.2d 556 (Tex.App.-Hous. (1 Dist.) 1993), involved nine plaintiffs who received no money for past damages, and future damages ranging from $20,000.00 to $65,000.00. In the case of Cain v. Armstrong World Industries, 785 F.Supp. 1448 (S.D.Ala.1992), the trial court granted a new trial finding that the jury's six figure compensatory damage awards were not only greatly disproportionate to the injury in each of the cases but also the damage awards were unsupported by the evidence. The trial court in Cain, in its reasons for granting a new trial, cited another Alabama case in which four asbestosis cases were consolidated for trial, and the jury awarded compensatory damages of $6,500.00 to two of the four plaintiffs. The Institute for Civil Justice published an article in 1984 stating that the average total compensation awarded was $54,000.00 for asbestosis, $83,000.00 for lung cancer and $256,000.00 for mesothelioma, and that only a small percentage of the claimants with no manifest asbestos-related injury received compensation; those few that did usually only received a few hundred dollars.[32]
In asbestos litigation, there is a significant variance in the assessment of damages by juries, and similarly situated asbestos victims may receive payments that vary by a factor of ten or more.[33] In New Jersey, a verdict for pleural plaques will be in the $0-$15,000.00 range, while in nearby Pennsylvania, before a substantially similar jury, the same case could easily receive a $250,000.00 verdict. In some jurisdictions, for every five claims brought, one or two will result in defense verdicts, one or two will be a plaintiffs verdict in the range of $10,000.00-$25,000.00, and the fifth will receive a jury verdict of $100,000.00-$1,000,000.00. The facts making up those claims are often identical; same claimed exposure, same age, same x-ray readings, and the same doctors testifying to the same sets of medical facts; however, the jury verdicts differ.[34]
Each quantum award must be evaluated based on the facts of each individual case. Given the conflicting medical evidence presented to the jury in this case, we cannot say that the jury quantum awards in this case were unreasonable. We will next discuss the individual plaintiffs' quantum awards and the jury's liability findings concerning the settling defendants, which affect virile share contributions to the damage award.

ALFRED ADAMS
The jury awarded Alfred Adams $12,150.00 in general damages. The trial court's JNOV raised this damage award to $27,150.00. We reverse the JNOV and reinstate the jury's damage award.
Adams worked for Avondale in the Main Yard from 1962-1974, for approximately 14 years, as a shipfitter. He was *100 71 at the time of trial (1996). He never smoked. During the time he worked at Avondale, Adams worked around asbestos products such as Unibestos, Calcilite, Super-7, and Super-11. He used asbestos cloth that had names like Weldguard, Fireguard, and Unigard. He also used asbestos packing and "rope on a roll." The gaskets and packing were made by GAF. He saw the Johns-Manville name but could not associate it with a specific product. Adams's work history as reported to Dr. Cook shows occupational exposure to asbestos in the engine room where he sometimes worked alongside insulators. He said he never heard a warning about asbestos from anyone, nor was he ever given a respirator.
In 1974 Adams fell 30 feet into the hold of a ship; he has been disabled ever since. The accident broke ribs on both sides, his collarbone, and caused a compound fracture of his leg. He suffered significant chest trauma in this accident. He testified that these injuries caused him some breathing problems, but nothing like he suffers today. Since the 1974 accident he has led an inactive lifestyle. Medical reports from 1975 and 1976 show that he suffered from shortness of breath and breathing problems.
Drs. Gaziano and Zimmet testified for the plaintiff regarding Adams's asbestos-related medical condition. Dr. Gaziano opined that Mr. Adams had asbestosis with a mild to moderate degree of pulmonary functionary impairment. Dr. Zimmet diagnosed pulmonary asbestosis. Neither doctor knew about Adams's 1974 accident.
Dr. Cook examined Mr. Adams on behalf of the defendants. He reported that Adams began experiencing shortness of breath following his fall in 1974. Adams reported that his shortness of breath never improved. Since his disability in 1974 he has had an inactive lifestyle. Dr. Cook found no evidence of interstitial lung disease, pulmonary fibrosis, pleural thickening, or lung crackles and wheezes. He related any shortness of breath to Adams's significant chest trauma in the 1974 accident, and his sedentary lifestyle since. Dr. Cook testified that Adams did not suffer from asbestosis.
The jury heard evidence that Adams had been exposed to asbestos while employed at Avondale, and that his lungs showed markers of that exposure visible by x-ray. They also heard evidence that Adams, a 71 year old who had lived a sedentary lifestyle for 21 years before trial, suffered a traumatic chest injury that was likely to cause his shortness of breath and x-ray markers. The plaintiff doctors gave a diagnosis of asbestosis on the basis of the x-ray and pulmonary function tests alone, without knowing Adams's medical history of the significant chest trauma he suffered in the 1974 fall. The defendants' doctors testified that Adams did not have asbestosis. In light of these factors, the jury's damage award of $12,500.00 was reasonable. Evidence was presented that could allow the jury to conclude that Adams was minimally affected by his exposure to asbestos. The JNOV increasing Adams's damages is reversed, and the jury's damage award is reinstated.
Regarding Mr. Adams's claim, the jury returned findings against all of the nine settling parties[35] that the trial court reversed in its JNOV. Previously in this opinion we affirmed the grant of JNOV in favor of five parties (Anchor Packing, Armstrong World Industries, Flexitallic, *101 Garlock, and Uniroyal). As to the remaining four (Babcock & Wilcox, Combustion Engineering, Rapid America, and Rock Wool), as a shipfitter, Adams worked in the engine rooms of ships in the presence of boilers. The insulating cement that was used in Combustion Engineering boilers had Combustion Engineering's name on it, and the insulating cement used for the Babcock and Wilcox boilers had their own name on it as well. There is evidence in the record that the installation of these boilers required the application and removal of the asbestos cement, which produced large amounts of asbestos dust. There is sufficient evidence to support the jury's finding against Combustion Engineering and Babcock & Wilcox in favor of Adams.
Rapid American made Careytemp insulation, which was similar to Kaylo in its use and propensity to emit copious amounts of asbestos dust when used as intended. The evidence supports a finding that Adams and other shipfitters were exposed to insulation dust while working in the ships, and therefore the evidence reasonably supports the jury's finding against Rapid American in favor of Adams. Likewise, Rock Wool manufactured Delta Made One Shot cement, the most widely used asbestos-containing cement at Avondale, which was used to finish pipe insulation in the engine rooms. The evidence shows that the use of this cement added large amounts of asbestos to the work environment, and therefore the jury's finding against Rock Wool in favor of Adams is also supported by the record.
Accordingly, Adams's individual judgment is amended to reverse the trial court's JNOV and reinstate the jury's verdict against four of the nine settling parties: Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool.

LESTER BADEAUX
The jury awarded Lester Badeaux $6,000.00 in damages. On JNOV, the trial court increased it to $18,500.00. We reverse the JNOV and reinstate the jury's damage award.
Badeaux worked at Avondale from March of 1968 to January of 1972, and again from July of 1972 until September of 1972, for a total of 4 years and one month. He told Dr. Emory that he was never exposed directly to asbestos products, though at trial he testified that he used fire blankets a lot, and that he worked around insulation and "half-rounds" a lot. He identified Kaylo as the half-rounds and said he used mud and the asbestos cement One Shot. He saw Garlock and Flexitallic gaskets but did not work with them; he also saw rope packing but did not use it. He had never heard of Unibestos. As a shipfitter, the majority of his work was not performed around the insulators. He left Avondale in 1972 and at trial was "feeling fine," and only went to get tested for asbestosis because other friends of his were getting tested.
At the time of trial, Badeaux owned his own dump truck and worked full time. He testified that he had some shortness of breath. He had a chest x-ray in 1990 when he had some chest pains; it was interpreted as normal, and he had no restrictions on his activities. Dr. Gaziano diagnosed him with asbestosis and minimal pulmonary impairment; Dr. Emory found that he had no asbestos disease, and found his pulmonary function tests were normal. On cross examination, Dr. Gaziano stated that he could not say that Badeaux had any lung function impairment, which differs from his report.
After considering Badeaux's exposure to asbestos that ceased over 20 years before trial, medical test results, and current good health, the jury awarded him *102 $6,000.00. Considering the evidence, which can be interpreted to find Badeaux was minimally affected by asbestos, we cannot say that the jury was unreasonable in awarding its verdict. The judge erred, therefore, in increasing the damage award on the motion for JNOV.
Of the nine settling parties, the jury returned findings against 6: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Garlock, Rock Wool, and Uniroyal. As noted, this court affirms the JNOV in favor of Anchor Packing, Garlock, and Uniroyal. Regarding Babcock, Combustion, and Rock Wool, while Badeaux did not specifically testify that he worked around boilers, he did testify that he worked in the engine rooms, where the boilers are located. For the same reasons as expressed regarding Alfred Adams, the evidence supports the jury's findings against these two boiler manufacturers, and likewise supports a finding against Rock Wool, the cement manufacturer. The trial court's JNOVs in their favor are reversed as to Mr. Badeaux, and the jury's findings are reinstated.

LEROY BONAMOUR
The jury awarded Bonamour $12,800.00. The JNOV increased it to $27,800.00. We reverse the JNOV and reinstate the jury's damage award.
Leroy Bonamour worked for Avondale in the main yard for approximately 20 years total, from 1957-58, 1961-76, 1977-79 and 1980-81, as a tacker. He was sometimes loaned out to different crafts when things were slow. He worked with machinists, boilermakers, and hydraulic mechanics. Ninety-five percent of his work was done on ships.
Mr. Bonamour testified that he worked with Kaylo. He also testified that he worked around Hopeman Brothers. He worked around pipe covering, cement, asbestos cloth gaskets, packing, and blankets. He remembered product names like Kaylo, GAF mud, Unibestos, Garlock, Marinite, and Micarta. He worked all over the ship when installing labelplates. He worked on icebreakers, LST's, DE's, DEG's, Coast Guard cutters, ESSO tankers, Lykes ships, Gulf Shipsides, Navy vessels, LASH ships, and LNG's.
Bonamour stated that it was very dusty in the engine rooms and where Hopeman Brothers worked. He never attended any safety meeting with respect to any of the products he was using at Avondale. He never used a respirator and was never offered a respirator during the years he worked at Avondale.
Bonamour was examined by Dr. Casolaro for the plaintiffs and Dr. Emory for the defendants. Dr. Casolaro diagnosed Bonamour with asbestosis with moderate pulmonary impairment. He found that Bonamour's x-ray showed interstitial lung disease and pleural plaques. Dr. Casolaro stated that Bonamour has a greater risk of developing cancer.
Dr. Emory diagnosed pleural disease. He pointed out that Bonamour had asthma and bronchitis. Bonamour admitted that he had smoked ½ pack cigarettes a day since 1955. Dr. Emory's report found pleural plaques or pleural thickening caused by asbestos, but he concluded Mr. Bonamour did not have asbestosis.
The jury clearly concluded that Bonamour had been exposed to asbestos. However, given the conflicting medical testimony as to what effect the asbestos exposure had on Bonamour, we cannot say that a reasonable person would not have a basis for awarding damages of $12,800.00.
Of the nine settling parties, the jury returned findings against 7: Anchor Packing, Babcock & Wilcox, Combustion *103 Engineering, Garlock, Rapid American, Rock Wool, and Uniroyal. As noted above, we affirm the JNOV in favor of Anchor Packing, Garlock, and Uniroyal. Bonamour's testimony that he worked along side boiler makers, and the evidence regarding the boilers' asbestos-containing insulation, is sufficient to support a finding against Babcock & Wilcox and Combustion Engineering. Likewise, for the reasons expressed for Alfred Adams against Rock Wool and Rapid American, there is sufficient evidence for the jury's findings against them in favor of Mr. Bonamour. The JNOVs in their favor are reversed as to Mr. Bonamour, and they are returned to his virile share calculation.

WILLIAM BOUDREAUX
William Boudreaux was awarded $6,800.00 by the jury. The JNOV raised it to $19,300. We reverse the trial court's JNOV and reinstate the jury's damage award.
Boudreaux was 45 years old at trial. He worked as a tacker from 1/68-12/68. He was rehired in 8/69-3/70 as a tacker. Then he was rehired again in 2/72-6/72. In 8/73 he was rehired as tacker-welder until 4/74. All of these employment stints were at the Harvey Quick Repair Yard. Boudreaux only worked at the main yard for two months in 1968. He worked at Avondale for only about 27 months total, and had last been employed there 21 years before trial. He worked around insulators and pipefitters while working on ships. He worked with the cloth but did not cut any himself. At the time of trial he worked for the Jefferson Parish School Board.
Boudreaux testified that he was "exposed" to asbestos cloth and packing. He stated that he also used asbestos cloth to protect himself. He worked around pipe covering and cement on a "daily basis." He stated that he saw no warnings of asbestos dangers on any products. He further testified that he attended no safety meetings. He stated on cross that he did not use pipe covering; at most, he held it.
Boudreaux remembers seeing the product Kaylo when he went to the warehouse. At the main yard, he worked on the MICHIGAN cargo ship and the SAN FRANCISCO tanker (Exxon). He worked on tug boats and push boats performing "quick" repairs. He worked on the exhaust systems as a welder and tacker. He testified that he worked everywhere on the ship around insulators and pipefitters.
Boudreaux was examined by Dr. Gaziano for the plaintiffs and Dr. Jones for the defendants. Dr. Gaziano diagnosed Boudreaux with asbestosis with a significant but undetermined degree of pulmonary functional impairment. Dr. Jones diagnosed Boudreaux with no asbestos-related conditions and no lung impairment. Dr. Jones's report states that Mr. Boudreaux had normal lung and pleural appearances. Also, his volumes, spiromatic tests, and diffusing capacity were normal.
The jury awarded Mr. Boudreaux $6,800.00. Considering the brevity of his employment, and the conflicting medical reports, the jury award was reasonable and is reinstated. Evidence existed to allow the jury to have concluded that his exposure was not significant and that he was minimally affected by it.
Of the nine settling parties, the jury found against five: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Garlock, and Rock Wool. As noted above, the trial judge's JNOV in favor of Anchor Packing and Garlock is affirmed.
Though he did not specifically mention boilers, Boudreaux's description of his job duties and location supports the finding that he worked in the engine room *104 around the boilers. Therefore, the evidence supports a finding against Babcock & Wilcox and Combustion Engineering for the reasons expressed for Alfred Adams. Likewise, his testimony that he worked around pipe covering and cement, and the evidence that the cement produced serious emissions of dust, is sufficient to support a finding against Rock Wool. The trial court's JNOV in their favor are reversed as to Mr. Boudreaux, and they are returned to his virile share calculation.

OSCAR CHAMPAGNE
The jury awarded Champagne $16,800.00. On JNOV, the trial court increased Champagne's award to $31,800.00. We reverse the trial court's JNOV and reinstate the jury's damage award.
Oscar Champagne was 59 years old at the time of trial. He worked at Avondale from 1967-1973 as a pipefitter helper and pipefitter. He himself did not use any asbestos products, although sometimes he had to cut wallboard and pipe insulation. Mr. Champagne testified that he was exposed to asbestos in his work environment. He worked on the last three Coast Guard cutters and the destroyer escorts.
Some of the products Champagne remembers working around were the half-round pipe insulation, asbestos blankets, asbestos blocks, and gray colored mud. He worked around Hopeman Brothers, who were hanging wallboard; he did not know the name of the board, but did state that it had a veneer.
After leaving Avondale, Mr. Champagne worked in some of the chemical plants on the river. His next major employment was at Good Hope Refinery for a contractor. Some of the job sites had insulation that looked like the same substances as at Avondale.
Mr. Champagne did not know about the dangers of asbestos until sometime in the 1990's, when a friend told him there was testing in Pascagoula. Mr. Champagne was concerned about his diagnosis and was worried about his increased chance of getting cancer both for himself and his family.
Dr. Zimmet examined Mr. Champagne for the plaintiffs in June of 1995. Based on the medical tests and his history of exposure, Dr. Zimmet concluded that Champagne had asbestosis. Mr. Champagne was examined by Dr. Rosenberg for the defendants. Dr. Rosenberg found a moderate amount of bilateral pleural thickening bilaterally consistent with asbestos exposure. Pulmonary function tests performed in his office showed normal lung volumes, with borderline low diffusion. Dr. Rosenberg concluded that the pleural changes were likely due to asbestos exposure, but found no evidence of interstitial lung disease related to asbestos exposure.
Though Champagne worked at Avondale for only 6 years, the defendants' doctors found x-ray evidence of pleural changes consistent with asbestos exposure, and some decreases in the pulmonary function tests, though they disagreed with the plaintiff's doctors on the ultimate diagnosis of asbestosis. The jury concluded that Champagne was affected by asbestos, though apparently not in a major way. The jury's award was reasonable considering the conflicting medical evidence.
Of the nine settling parties, the jury returned findings against six: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Garlock, Rock Wool, and Uniroyal. As noted above, we affirm the trial court's grant of JNOV in favor of Anchor Packing, Garlock, and Uniroyal. As a pipe fitter, Champagne worked in close proximity to insulation, gaskets, and mud, sometimes having to tear them up, which produced dust. Champagne's testimony *105 and the testimony of other pipe fitters supports the jury's findings against Babcock & Wilcox, Combustion Engineering, and Rock Wool. The trial court's JNOVs in their favor are reversed as to Mr. Champagne, and they are returned to his virile share calculation.

ROGER H. QUAVE
The jury returned a verdict awarding damages in the amount of $12,800.00 to Quave. The trial court in its JNOV increased Quave's award of damages to $27,800.00. We reverse the trial court's JNOV, and reinstate the jury's damage award.
Quave worked at Avondale from 1957 to 1976. He started as a first class outfitter and was eventually promoted to leaderman, foreman, and finally general foreman. In 1965, he became Assistant Superintendent.
Quave was first exposed to asbestos while working at Equitable Shipyard. He worked there on three separate occasions: the first as a pipefitter, the second as a tacker, and the third as a welder. He was exposed to asbestos on all three occasions.
Quave believed that he was also exposed to asbestos while working at Avondale. While working in the engine rooms, he was exposed to asbestos-containing products such as half round pipe insulation, mud, and asbestos cloth. The installation of pipe insulation created a great deal of dust in the work area. Quave remembered such brand names as Kaylo and Ruberoid.
Dr. Lorino examined Quave for the plaintiffs. He diagnosed him with pleural disease, or pleural changes, as a result of his exposure to asbestos. Dr. Grimstad examined Quave for the defendants. He testified that Quave had normal pulmonary function, with changes in his left lung base indicative of chronic inflammation, but no indication of asbestosis. Dr. David Hunter testified that Quave's x-ray showed an abnormality, but no pleural changes. Chest x-rays from 1994 and 1995 indicate a possible pleural plaque on the left lung.
Based on the conflicting medical evidence, the jury's damage award is reasonable and is reinstated. Evidence exists in the record to allow the jury to have concluded that Quave had been exposed to asbestos but was minimally affected.
Of the nine settling, liable, non-parties, the jury returned findings against 7: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Garlock, Rapid American, Rock Wool, and Uniroyal. As noted above, we affirm the trial court's grant of JNOV in favor of Anchor Packing, Garlock, and Uniroyal. Quave's testimony that he worked in the engine rooms around insulation, asbestos mud, and cement support a finding against Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool for the reasons expressed previously in this opinion regarding these manufacturers. The trial court's JNOVs in their favor regarding Mr. Quave are reversed, and they are returned to his virile share calculation.

ALVIN ROBIN
The jury awarded Mr. Robin $76,500.00. This award was not changed on JNOV. The judgment on appeal is the jury's damage award, not a JNOV. Therefore, this court must consider Mr. Robin's award under the manifest error standard, which is not the same standard under which it must consider the JNOV awards of the other plaintiffs in this group. The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Before a trial court award may be set *106 aside as inadequate or excessive, the reviewing court must look first, not to prior awards, but to individual circumstances of the instant matter before it. Only after an analysis of the facts and circumstances peculiar to the instant case can a reviewing court determine the award is either excessive or inadequate. The reviewing court may not merely look at past awards for similar injuries in the determination of whether the trier of fact abused its much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979).
Mr. Robin was 68 years old at time of trial. He worked at Avondale from 1952 to 1982. He was a welder in the main yard, and worked onboard the vessels. Mr. Robin recalls working on the Delta Lines, DE's, DEG's, Coast Guard Cutters, LASH cargo ships, Lykes cargo ships, and just about every ship on dry dock. His job was to weld pipes. After welding the pipes, the pipes were insulated. Then they would test the boilers with water, and leaks would be identified. The insulation would have to be removed, and he would find the leak and fix it. In this process, he was exposed to half round pipe insulation, asbestos mud, and cloth. Although he worked mostly in the engine room, he also worked "all over the ship."
In 1980, Mr. Robin sought treatment from Dr. Bagnetto for "breathing problems." He was told he had a pulmonary disease. A few weeks later, he was sent to work in the pipe shop in order to get away from the dust and fumes.
Mr. Robin testified that Dr. Mitchell diagnosed him with asbestosis. He was later examined by Dr. Zimmet for the plaintiffs, who told Mr. Robin that he had asbestosis. Dr. Zimmet found bilateral pleural thickening. The defendants' expert, Dr. Thomas Grimstad, testified that he examined Mr. Robin and reviewed his chest x-rays and pulmonary function tests. Dr. Grimstad noted bilateral pleural plaques on Mr. Robin's chest x-ray, but did not note any interstitial changes. Dr. Hunter found some pleural changes, but not enough to classify as pneumoconiosis, though he felt they could be potentially related to asbestos. A CT scan report on Mr. Robin's chest, dated June 2, 1993, was also admitted into evidence. This report states there are scattered areas of pleural thickening.
At the time of trial, Mr. Robin complained of being short of breath since 1980. He actually sought medical treatment for his breathing problems, whereas most plaintiffs simply sought diagnostic evaluations for this suit and did not require treatment. His Avondale records show that his job was modified due to his breathing problems. Mr. Robin was declared disabled after he was struck by a car in 1982. He had other medical problems, including prostate cancer, kidney stones, and degenerative joint disease in his spine. He also had heart problems for which he took medication.
The evidence shows that Mr. Robin worked for Avondale for 30 years and had breathing problems since 1980, and sought active treatment for his breathing problems. Given this evidence, we affirm the jury's quantum award of $76,500.00.
Of the nine settling, liable, nonparties, the jury returned findings against seven: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Garlock, Rapid American, Rock Wool, and Uniroyal. As noted above, we affirm the trial court's grant of JNOV in favor of Anchor Packing, Garlock, and Uniroyal. Robin testified that he worked mostly in the engine room and was exposed to half round pipe insulation, asbestos mud, and cloth. When pipes leaked he would have to remove the insulation, cloth, and mud, and weld the leaks. *107 These facts support the jury's findings against Babcock & Wilcox (boilers and asbestos cement), Combustion Engineering (boilers and asbestos cement), Rapid American (pipe insulation emitting dust when removed for repair), and Rock Wool (asbestos cement). The trial court's JNOVs in their favor regarding Mr. Robin are reversed, and they are returned to his virile share calculation.

CONCLUSION
In conclusion, we affirm the trial court's grant of JNOV in favor of Anchor Packing, Armstrong World Industries, Flexitallic, Garlock, and Uniroyal, because the evidence adduced at trial was insufficient and inadequate to establish that these defendants' products were a cause in fact of the plaintiffs' injuries. We have reserved consideration of the correctness of the trial court's JNOV in favor of Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool Manufacturing to a plaintiff specific analysis, because there was evidence upon which the jury could have reasonably based its conclusions that these products were present at Avondale, released asbestos dust into the plaintiffs' work environments, and were a significant contributing cause to the plaintiffs' injuries.
We reverse the trial court's grant of all the JNOVs raising the plaintiffs' damage awards, and reinstate all the jury's damage awards. The jury heard conflicting expert medical evidence on injuries caused by asbestos exposure, from diagnoses of disabling lung diseases to diagnoses of no adverse effects. We acknowledge, as did the trial judge in his Reasons for Judgment, that the jury awards as to most plaintiffs were "on the low side." The jury's quantum determinations, however, were based upon a reasonable interpretation of the conflicting evidence, and therefore the trial court erred in granting the JNOVs on quantum.

AVONDALE INTERESTS SPECIFIC ASSIGNMENTS OF ERROR

AVONDALE EXECUTIVE OFFICER LIABILITY
Six Avondale employees were sued for breaching the duty allegedly delegated to them by their employer to provide a safe workplace. Referred to in brief as either the "Executive Officers" or the "Avondale Interests," all six were found liable to each of the seven plaintiffs germane to this opinion. Each executive officer appealed, generally arguing that either Avondale did not delegate the duty for safety to him and/or that he breached no duty. For the various reasons discussed infra, we affirm as to some and reverse as to others.

LAW ON CO-EMPLOYEE LIABILITY[36]
Every employer has a statutory duty to provide its employees with a reasonably safe work place, including the furnishing and use of safety devices and safeguards. The employer is duty bound to adopt and utilize such methods and processes that are reasonably adequate to render the work place safe in accordance with accepted practices in the same or similar industries. LSA-R.S. 23:13.
The defendants in this case rely on Canter, Pisciotta v. Allstate Ins. Co.[37], Lytell v. Hushfield[38], and Brown v. White[39], *108 arguing either that there was no breach of a duty, or that they were not delegated a duty, or their duties were of a general administrative nature and thus not personal to the plaintiffs.
The seminal case of Canter v. Koehring Co., 283 So.2d 716 (La.1973), holds that this statutory duty to provide a safe workplace may be delegated to an employee and that employee may be held liable to a co-employee for a breach of that duty. Id. However, the employee to whom the duty was delegated cannot be held liable to co-employees because of the general responsibility delegated; rather, to be held liable this employee "must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages." Id. at 721. Thus, the fault of the employee cannot be a technical or vicarious fault but a personal one.
In Pisciotta v. Allstate Ins. Co., three Sears executives approved renovations of a building to be performed during working hours even though these renovations were taking place in close proximity to employees of the catalog department. Plaintiff was injured when several ceiling tiles fell on her. Initially the Court found all three Executive Officers liable for plaintiffs injuries. On rehearing, relying on Canter, the Court exonerated two of these Executive Officers, holding that although they had general responsibility for the safety of employees, they had not breached the duty through personal fault because they had delegated the responsibility of providing a safe workplace to a co-employee.
In Lytell v. Hushfield, the plaintiff was injured when he was forced to jump off of the forklift he was driving to escape being crushed by the freight he was transporting. He sued several Executive Officers, including the field safety manager, the dock foreman, the operations manager, and the terminal manager. The Court exonerated the field safety manager because the accident was not caused by his personal fault; rather, he had delegated the duty to provide a safe workplace to the other three Executive Officers. These three men knew of the defects in the forklift plaintiff was driving and did nothing to correct them. The Court found they breached the duty owed to plaintiff through their personal fault.
In Brown v. White, the plaintiff was injured while working on a blower. He filed suit against eleven Executive Officers, ten of whom were found not liable. The Court found that the employer's duty to provide a safe workplace was delegated to all eleven Executive Officers, who had the general responsibility to insure overall safety. The Court found that only Evans, the maintenance foreman, was personally liable to plaintiff because he had the specific responsibility to "inform his supervisory personnel of any safety problem made known to him to allow them the opportunity to rectify the situation." The testimony revealed that there were no established procedures for stopping the fan from rotating before working on the blower. Each mechanic was allowed to devise his own method of stopping the fan. Evans was informed by another employee that the procedure of stopping the rotation with a piece of wood or pry bar was unsafe. Evans was found liable to Brown because he failed to communicate this safety concern to his supervisors. The other supervisory personnel were found not liable since they were not aware of the safety complaints; thus, they breached no duty to Brown.
The plaintiffs rely on Cole v. Celotex, 588 So.2d 376 (La.App. 3rd Cir.1991), to *109 argue that the jury correctly determined the Executive Officers in this case breached a duty owed to plaintiffs. In Cole, the Court found it was "the responsibility of the industrial relations department, which answered to the general manager, through its staff, medical doctor and superintendent of safety, to adopt and formulate safety policies." Id. at 382. The Court found that the procedures to protect the plaintiffs from asbestos exposure were inadequate and held that the responsibility of a safe workplace "must be that of the top manager, the managers immediately below, the safety department, and the doctors." Id. The plaintiffs further argue the duty delegated to the defendants in the case at bar was for overall safety, not just asbestos exposure. They contend that since the Executive Officers failed to protect plaintiffs from injury, we should affirm the jury's finding of liability.
Our inquiry requires a review of the safety responsibility of each executive officer defendant in relation to the risks associated with the presence of asbestos in the work place. After review of the entirety of the evidence relative to those responsibilities, we must determine if the conclusions reached by the jury are reasonable and not manifestly erroneous. Simply, our task is to determine if the record evidence is sufficient to support the finding that each executive officer breached a standard of care delegated to him to provide a safe workplace for his fellow employees.

GOVERNMENT STANDARDS
The Walsh-Healey Act, enacted in 1951, was the first federal act relevant to safe handling of asbestos. It set a threshold limitation value (TLV) of 5 million parts per cubic foot (mppcf), which was the maximum level of asbestos dust to which a person could be exposed on average throughout his career without any adverse health effect. The act provided that when there was "any doubt concerning the presence of a harmful condition" the employer was required to have air samples taken in the "breathing zone of workers during normal operations." The act required the use of control measures, in the form of substitution of materials if possible, change in work practices (such as the incorporation of "wet methods"), and the use of ventilation when the TLV was exceeded. Walsh-Healey required the use of respirators only when control measures were impractical. The only significant change in Walsh-Healey took place in 1969 when the TLV was lowered to 2 mppcf.
The Occupational Safety and Health Administration (OSHA) asbestos regulations superseded Walsh-Healey on December 31, 1971. These were superseded by a more comprehensive set of asbestos regulations in 1972.
The OSHA regulations were similar to the Walsh-Healey requirements in that they required Avondale to comply with a safe level of asbestos, now referred to as the permissible exposure level (PEL). Control methods were to be used in the event asbestos levels exceeded the PEL. Control measures were essentially the same as those in Walsh-Healey, i.e., wet methods and ventilation. Respirators were to be used in the event the control measures were ineffective.
There were two significant changes required by the OSHA regulations. First, Avondale was required to conduct its own periodic air sampling to measure asbestos concentrations in the work environment. Second, the PEL was set at 5 fibers per cubic centimeter of air.[40]

*110 DUTIES DELEGATED TO THE DEFENDANTS

James O'Donnell was the head of the Avondale safety department from 1948 until he was replaced by Steven Kennedy on December 13, 1971. Mr. Kennedy remained head of the safety department until August 31, 1973, when John Chantrey took over as department head. It is uncontested that Avondale delegated the duty to comply with government asbestos safety regulations to these three men during the respective time periods each served as head of the department. However, they argue that no reasonable juror could have found them personally liable to any of these seven plaintiffs under the guidelines established in Canter. They claim that there is no evidence that they personally knew that these seven plaintiffs were exposed to unreasonable danger as a result of their work with or around asbestos-containing products. Instead, they claim that what was once thought to be "safe" levels of asbestos have now been determined to be unsafe and that these men should not have been judged based on today's knowledge and standards.
The other three Executive Officers named in this lawsuit, Peter Territo, George Kelmell, and J.D. Roberts, were employees who worked in the safety department. Mr. Territo was a safety inspector from 1960 or 1961 until after 1976, Mr. Kelmell worked in the department from 1961 until after 1976, and Mr. Roberts worked in the safety department from 1972 until 1977. Territo, Kelmell, and Roberts deny that they were delegated any duty for asbestos safety.
Of these six defendants, only Mr. Chantrey and Mr. Territo testified at trial. Mr. O'Donnell died in the 1970's, and Mr. Kelmell died in 1993. It is unclear from the record why Kennedy and Roberts did not testify.
Chantrey testified that he was hired in mid-1964 by Avondale as a personnel clerk. He was promoted to assistant personnel director, then assistant personnel and insurance director, then director of personnel benefit programs, and then director of personnel benefit programs and safety in 1972.
Chantrey was responsible for workers' compensation claims starting in 1964. He was aware that there was an occupational disease called asbestosis listed in the State Workers' Compensation Red Manual. Between 1964 and 1972, which was the time he oversaw workers' compensation claims, there were many pneumoconiosis claims at Avondale. Chantrey was not aware of the degree of the asbestos used in the shipyard prior to 1972, but he did know Avondale received claims for pneumoconiosis lung disease. He understood pneumoconiosis to be dust disease.
Chantrey testified that he was the administrator of the safety department from 1973 to 1981. In this position, he was responsible for setting up the safety department and determining the rules and regulations for the department. Chantrey explained that each geographic area had a safety professional. Mr. Territo was in charge of all of the safety professionals and their performance. Chantrey stated that he did not personally review a specific safety professional's conduct. Rather, Mr. Territo was the actual person who directed the safety personnel and followed up with them. Peter Territo was always safety director while Chantrey was safety administrator.
Chantrey was not aware of what his predecessor, Mr. O'Donnell, did to protect workers from asbestos, silica, or other things. Chantrey further testified that he and Mr. Territo were aware of the OSHA regulations regarding asbestos in *111 1972. He explained that the safety department took known government rules and regulations and made sure those rules were followed. He agreed that the safety department's job was to find out what was required by the law and then to find out what else needed to be done to insure workers' safety. He agreed that it was his duty to protect the employees of known hazards in addition to those the government had proscribed.
Chantrey agreed that the 1971 OSHA regulations set a standard dust level for asbestos not to exceed 5 fibers per cubic centimeter. He explained that this is accomplished by using local exhaust, vacuuming, and sweeping. He agreed that if the level could not be lowered to the required level, respirators are one of the measures that should be taken. Chantrey agreed that OSHA called for a dust mask when levels are between 25-50 fibers per cubic centimeter and a power filter respirator for levels between 50-250 fibers per cubic centimeter.
Chantrey testified that the respirator program may have already been in effect when he took over as head of the safety department. He was not aware that several plaintiffs testified that this respirator program did not start until the late seventies, almost ten years after OSHA. He was also not aware that several plaintiffs testified that the respirators were almost never required. Chantrey explained that respirators were the second measure to be taken; an effective ventilation system was the first. He stated that Avondale had an elaborate ventilation system that was coordinated by the production department and reviewed by the safety department.
Chantrey agreed that according to OSHA whenever a tear-out or demolition of pipes containing asbestos was done, respirators should have been used. He did not know exactly how Avondale cleaned up asbestos dust, whether it was by vacuum or sweeping. Chantrey admitted that he rarely ever physically went out the shipyard to inspect the area to see if Avondale was complying with OSHA regulations.
During Chantrey's testimony, the 1972 Federal Register OSHA regulations were introduced into evidence. This document was used to show the changes in the OSHA regulations from 1971 to 1972. The 1972 OSHA regulations limited the exposure to airborne concentrations of asbestos dust to 5 fibers per cubic centimeter of air over an 8 hour time weighted average. Additionally, these regulations stated that at no time may the peak concentration of asbestos dust exceed 10 fibers per cubic centimeter of air. Chantrey agreed that this meant that at no point may a worker be exposed to more than 10 fibers per cubic centimeter of air at any time during his work day. Chantrey was not aware of any effort to separate the work involving asbestos from the work that did not involve asbestos according to the "isolation" standard outlined in the 1972 OSHA regulations. He agreed that the 1972 OSHA standards called for separate clothing for employees who handled asbestos-containing products or worked in an area near asbestos products. He was not aware of the testimony of several plaintiffs stating that no one provided them with special clothing, special lockers, change rooms or laundering. It was Chantrey's position that these procedures were only to be used for individuals whose exposure was at or exceeded the threshold limit.
Documents were introduced to show that testing of airborne asbestos levels was done for the first time at Avondale in December of 1973. Chantrey testified that testing was done every six months in accordance with OSHA. The safety director was directed to contact the insulation department and determine where the asbestos *112 work was being done at the time the testing was scheduled. Several letters were introduced from Central Analytical Laboratory, the laboratory that conducted asbestos testing. These letters were addressed to Chantrey. Each of these letters stated that Avondale was in compliance with the OSHA standards, but noted that very little insulation work was being done at the time of the testing. The letter dated October 31, 1974 stated that of the four work stations only one area was tested. The letter dated June 18, 1975 stated that very little insulation work had been done at the time of monitoring and noted that they only spent one day monitoring instead of the usual two days. The letter dated December 31, 1975 stated that the asbestos dust levels at Avondale were in compliance with OSHA standards and reiterated that during this sampling and previous sampling, very limited insulation work had been performed. The letter went on to state that it might be advantageous to schedule the next monitoring during a peak insulation period. It was at this point that Chantrey testified that monitoring was scheduled every six months and not necessarily when insulation work was being performed.
While Chantrey was aware that in 1972 that OSHA required signs be posted to show where asbestos work was being performed to allow employees to protect themselves or stay away from the area, he had no personal knowledge of these signs being posted at Avondale. He explained that he understood that these signs were to be posted only when dust exposure was beyond the threshold limit.
The 1972 OSHA regulations also provided that any employee found to have been exposed to airborne concentrations of asbestos fibers be notified in writing no later than five days of the finding. When asked if Avondale practiced this, he responded that he had not received feedback on whether there were any deficiencies in this area.
Chantrey testified that he was not aware of warnings on any asbestos-containing products that were in use at Avondale in the early 1970's. Photographs of several products that were taken in 1972 were introduced. These photographs depicted boxes with warnings stating that the products contained asbestos fibers, and cautioned to avoid breathing the dust. One warning stated that if adequate ventilation was not available, then a respirator should be worn.
During Chantrey's testimony, a report entitled "Asbestos Replacement Materials and Applications in the Shipbuilding and Ship Repair Industry" was introduced. This document stated that in 1975 Avondale was estimated to be using up to 25,000 yards of asbestos fabrics annually in welding, and discussed possible replacement materials. The report also stated that Mr. Territo had concerns over the long range legal ramifications regarding Avondale's use of asbestos.
Peter Territo testified that he started working at Avondale in 1952 as a time keeper. He started to work in the safety department in 1960 or 1961 and Mr. O'Donnell taught him "how to be a safety man." He explained that O'Donnell was responsible for being aware of the government regulations and implementing Avondale's safety policies. Territo testified that it was never his job to look up government regulations and implement policies. In 1975, Territo became manager of safety services. Even in this position, he testified that he did not have to read the OSHA regulations and develop policies. He further testified that Kelmell did not have to look up the regulations and develop policy. When Roberts came to work in the safety department in the early 70's, he *113 did not have the duty to look up the regulations and develop policy. Territo explained that during the entire period from 1952 until the end of 1976, it was O'Donnell, Kennedy, and Chantrey who were responsible for looking up the regulations and developing policies. However, Territo agreed that while he worked under Chantrey, Chantrey relied on him and Kelmell to be sure OSHA regulations were followed.
When Territo joined the safety department, there were 12 to 14 superintendents of various departments. O'Donnell met with them every week or two and they were responsible for relaying safety information to their departments. Territo and O'Donnell periodically attended the safety meetings between the superintendents and their foreman, but not on a regular basis. Territo testified that he personally went on the ships and in the engine rooms every day. During the time period the Walsh Healey Act was in effect, he testified that personnel from the Department of Labor inspected Avondale twice per year. He was never informed by any of these inspectors that Avondale was not handling insulation properly. He testified that he was never informed that Avondale received any citations regarding asbestos during the 1960's.
Territo testified that the use of exhaust fans at Avondale started in the mid 60's. The insulators wet the insulation before it was cut to decrease the amount of dust. In 1965, a hood was installed in the insulation shop in response to complaints from insulators that the dust particles would "hurt their noses" and "stick in their throats." During this time, nothing was mentioned about the dust being dangerous. He testified that there was dust floating in the air in the engine rooms, but he never observed the dust clouds described by the plaintiffs. He explained that there was exhaust ventilation in the engine rooms, but there were no local exhaust systems to remove dust from the immediate work space.
Territo testified that although he was not present to observe these procedures being followed, when rip-outs were done in the 1970's the insulation was wet down and respirators were worn. He acknowledged that it "may have been his job" to find out if these procedures were being followed and report to Mr. Chantrey if they were not; however, he did not do this.
Territo testified that in response to the changes in OSHA regulations in the 70's, signs were placed near the areas where asbestos was being used and work areas were isolated from asbestos work. He denied that in the 1970's testing of asbestos levels was done in areas where insulation was not being performed. Territo testified that they were never told asbestos was dangerous, and if they had been they would have done something about it. Territo denied any recollection of the 1975 document that stated he was concerned about the legal ramification of Avondale's use of asbestos products.

EXPERT TESTIMONY
Dr. John Dement, an expert in the areas of industrial hygiene, epidemiology, asbestos disease and asbestos disease prevention, testified on behalf of the plaintiffs. He explained that diseases caused by asbestos include asbestosis, lung cancer, cancer of the mesothelial lining of the pleural and peritoneum, and gastrointestinal cancer. Lung cancer constitutes the greatest health risk for American asbestos workers. He testified that it was known from 1969 to 1973 that if a man had asbestosis, to allow him to continue to be exposed in a factory that was releasing asbestos dust would continue to injure his lungs.
Dr. Dement testified that asbestos was the first substance that OSHA regulated *114 on an emergency basis. The first regulations were issued in December 1971. At this time, asbestos was considered a very, very serious industrial hazard because asbestos has very poor warning properties. It is too small to see, and it is colorless and odorless. He explained that the Walsh-Healey Act was a law requiring certain safety standards be followed while performing work on government contracts. He stated this act required a facility to have an industrial hygiene program. Dr. Dement explained that asbestosis is a dose related disease and the Act was meant to reduce the amount of asbestos dust in the air while working. Dr. Dement testified that the presence of visible dust in the air is certainly an indication of a problem. He explained that visible dust in the air begins at dust concentrations in the range of 15 to 20 million particles per cubic foot. He testified that there has been a progressive drop over the years of the safe threshold limit of asbestos dust.
Mr. Danny Joyce was qualified as an expert in industrial hygiene and the regulation and use of asbestos in shipyards. He worked at Avondale from 1980 to 1991. Since leaving Avondale he has worked as a consultant in industrial hygiene.
Mr. Joyce testified that there was a lot of information discovered relative to asbestos in the mid to late 1960's. The TLV was lowered due to the information discovered in the Harris study in 1968, which determined that the Walsh-Healey TLV of 5 parts per cubic foot was not safe.
Mr. Joyce testified that in 1960, when O'Donnell was at Avondale, the Department of Labor would have had no scientific studies available to it suggesting that pipe covering operations created a substantial health hazard. The studies at that time indicated 4-12 fibers per cubic centimeter were not harmful, and that is what the dusty conditions would have reflected in a shipyard.
Mr. Joyce testified that he was working at Avondale during the conversion project of the USS Iowa, a battleship that was "mothballed" after World War II. It was brought to Avondale to be refurbished in order to be put back into commission in the 1980s. This involved removing the old asbestos material. During this process the air was monitored (as per OSHA) as work progressed. They collected thousands of hours of air samples on a wide variety of asbestos removal operations. After being consulted in this case, he reviewed the information in an attempt to extrapolate what the asbestos levels might have been at Avondale during the '40's, '50's, and '60's.
Mr. Joyce testified that using the data collected during the refurbishment of the USS Iowa, he estimated asbestos levels ranged from 1.9 fibers per cubic centimeter to 13.5 fibers per cubic centimeter. He noted that these levels were well below the accepted safe levels of the 1940s through the 1960s. These levels are also within the first OSHA recommended safe levels of 5 fibers per cubic centimeter and below the 1976 standard of 2 fibers per cubic centimeter. Mr. Joyce testified that these levels reflected the use of good engineering controls in place, such as wet method and exhaust ventilation. He acknowledged that these methods would not have been used in the 1940s-1960s, and agreed that had air sampling been done at during this time period, the levels would have likely been higher.
Mr. Joyce explained that his calculations were derived by using the time weighted average (TWA), which refers to an individual's exposure in an 8 hour day, 40 hour week, extrapolated over a lifetime. He explained that this was a better approach because concentrations of asbestos are seldom *115 consistent throughout the day. TWA takes into consideration the daily peaks and valleys of exposures. TLVs were always based on TWAs. Mr. Joyce testified that according to his research, industrial hygienists during the 40's, 50's, and 60's would have had no reason to think that bystander workers (workers other than insulation) were at any risk from asbestos dust.
Mr. Joyce testified that his research indicated that no citations or warnings were issued to Avondale between 1951 and 1969 regarding violations of the Walsh-Healey Act. He explained that another disciplinary method for a violation of the act was the cancellation of a contract. He found no evidence of canceled government contracts; rather, he saw evidence to the contrary that there was encouragement in the government for contracts to go to Avondale. It was Mr. Joyce's opinion that from 1971-76, Avondale was either in compliance with OSHA regulations or in the process of developing compliance programs as quickly as possible.

TESTIMONY OF THESE SEVEN PLAINTIFFS
Alfred Adams worked at Avondale from 1962 until 1974 as a shipfitter. He testified that he never heard a warning about asbestos from anyone, nor was he ever given a respirator.
Lester Badeaux worked at Avondale from February 1968 until January 1972 and again from July until September 1972. He started as a tacker and moved up to shipfitter. He testified the working conditions were very dusty "with everybody trying to work at the same time." He further testified no one told him to use respiratory protection.
Leroy Bonamour worked at Avondale from 1952-58, 1961-76, 1977-79 and 1980-81. He was a tacker, labelplate installer, test coordinator, and occasionally worked helping other crafts when his area was slow. He sometimes worked in engine rooms where it was very dusty. He explained the other workers cut insulation using a regular saw and the dust would trickle down to his work area. The ventilation systems were inadequate. Mr. Bonamour testified that some workers used air hoses for ventilation, which stirred up the dust. He testified that he never attended safety meetings that discussed asbestos. He was never offered a respirator during the 17 years he worked at Avondale.
William Boudreaux worked at Avondale for a total of 27 months between 1968 and 1976. He worked as a tacker and welder, which put him near insulators and pipefitters. He testified that he never received any warnings or attended any safety meetings regarding asbestos.
Oscar Champagne worked at Avondale from 1967 until 1973, first as a pipefitter helper, then as a pipefitter. He testified that his working conditions were very dusty and there were a few blowers blowing the dust around. He first became aware of the dangers of asbestos in the early 1990's.
Roger Quave testified that he worked at Avondale from 1957 until 1976. He started as a first class outfitter and was eventually promoted to leaderman, foreman, and general foreman. In 1965 he became an Assistant Superintendent. He testified that when he worked in the engine rooms the installation of pipe insulation created a great deal of dust. He was never warned that asbestos could cause lung disease.
Alvin Robin testified that he worked at Avondale from 1952 until 1982 as a welder. He worked in the engine room and other areas of the ship. Sometimes after the pipes were insulated, leaks would be identified and the insulation would have *116 to be removed in order to fix the leak. In this process he was exposed to a lot of asbestos dust. When he returned home from work in the evenings, he changed his clothes in an outside shed because they were covered with dust.

LIABILITY OF THE EXECUTIVE OFFICER DEFENDANTS RELATIVE TO THESE PLAINTIFFS
O'Donnell, Chantrey, and Kennedy acknowledge (in brief) that they were delegated the duty to comply with the government regulations regarding asbestos safety, but claim the jury committed manifest error in finding them liable. We disagree.
During the entire tenure of O'Donnell, the Walsh-Healey Act was in effect. While the Walsh-Healey Act did not require Avondale to measure asbestos dust levels on a periodic basis, the act did require levels be measured if there was any indication the established levels were being exceeded. Every plaintiff who testified described the dusty conditions at Avondale. Dr. Dement testified that the presence of visible dust indicated the levels exceeded those set by Walsh-Healey. Chantrey testified that if there was as much dust in the air as described by plaintiffs, then the levels should have been monitored. The evidence is clear that during O'Donnell's tenure the testing of asbestos dust levels was not performed and it was reasonable for the jury to conclude that those levels could have exceeded Walsh-Healey's requirement at various times. Furthermore, the evidence also suggests that O'Donnell should have been aware that there was a potential for harm from the inhalation of asbestos dust, yet very few, if any, preventative measures were taken during his tenure. And while plaintiffs assert that the standard of care is more than simply complying with government regulations, we need not reach that conclusion because the jury could have reasonably found that the government standards of the time were not followed.
During the time period that Kennedy and Chantrey headed the safety department, the OSHA regulations were in effect. The documents introduced during Chantrey's testimony revealed that when testing of asbestos levels were finally carried out in 1973 in an attempt to comply with OSHA regulations, the testing was done at a time when there was little asbestos work taking place, making the asbestos dust levels measured unreliable. The evidence indicates that OSHA required the establishment of adequate ventilation and dust removal procedures. OSHA further required the use of respirators if dust levels could not be limited. OSHA also required that work involving asbestos products be separated from work not involving asbestos products, and that separate clothing and changing facilities be provided for workers using asbestos products. The evidence indicates that these regulations were not followed. Further, although Chantrey denied knowledge of warnings on asbestos products in the early 1970's, the evidence was clear that warnings were present on some products; the evidence is equally clear that Avondale's safety directors did not heed or pass the warnings to its personnel. Plaintiffs' testimony shows that Avondale did not warn them of any dangers of asbestos fibers. Additionally, Chantrey testified that while working in the workers' compensation claims department, he knew asbestosis was an occupational disease caused by inhalation of dust. As with O'Donnell, the evidence strongly suggests that during Kennedy and Chantrey's tenure they knew or should have known of the dangers (or at least some of the dangers) of asbestos inhalation, yet there is scant evidence that any protective *117 measures were taken. Furthermore, it was not unreasonable for the jury to conclude that the independent testing required by OSHA was not reliable and that Chantrey knew it was unreliable.
Considering this evidence, as well as the entirety of the record on the issue, we cannot say the jury was clearly wrong with respect to the liability of O'Donnell, Chantrey, and Kennedy for all of the plaintiffs discussed herein, except Lester Badeaux. The evidence clearly shows that Mr. Badeaux stopped working at Avondale in 1972. Thus, there can be no imposition of liability on the part of Chantrey for Mr. Badeaux.
Territo, Kelmell, and Roberts deny that they were delegated any duty relative to asbestos safety. However, Territo testified that it was his duty to be sure there was compliance with the safety regulations. He stated that he went onboard the ships and in the engine rooms on a daily basis to be sure these regulations were followed. He testified that there was dust floating in the air in the engine rooms and explained that although there was ventilation, there was no exhaust to remove the dust from the immediate work space. During Territo's testimony, a document was introduced that indicated that he expressed concern over the long range legal ramifications regarding Avondale's use of asbestos products. Additionally, Chantrey testified that he relied on Territo to be sure the OSHA regulations were carried out. Chantrey also testified that Territo was in charge of all of the safety professionals and their performance, and that it was Territo who directed the safety personnel and followed up with them. We find the evidence sufficient to support the jury's finding that Territo was delegated the specific duty to ensure that Avondale complied with OSHA regulations regarding asbestos use and that he breached that duty. His admitted knowledge of the dangers of asbestos dust, his recognition that it was present, at least in the engine rooms, and the lack of any preventative measures, other than arguably inadequate ventilation, provides sufficient basis for us to say that there was no manifest error by the jury as to Territo's liability.
On the other hand, the evidence regarding the duties of Kelmell and Roberts is scant. The only evidence presented established that they worked in the safety department during the time these plaintiffs were employed at Avondale.[41] Under the holdings of Canter, Pisciotta, Lytell, and Brown, this is insufficient to hold these defendants liable to the plaintiffs. There was no proof that Kelmell or Roberts breached a personal duty owed to plaintiffs. Accordingly, the findings of liability on the part of Kelmell and Roberts are reversed as to all plaintiffs.

CONCLUSION
The fact finder has a duty to assess the demeanor and credibility of all witnesses, lay and expert. A reviewing court may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989).
For the reasons discussed above, we find the jury had sufficient evidence to support *118 the conclusions reached with respect to O'Donnell, Kennedy, Chantrey, and Territo, with the exception of liability of Chantrey for plaintiff Badeaux. In view of the scant amount of evidence presented with respect to Kelmell and Roberts, we find the jury was clearly wrong in finding that Kelmell and Roberts personally breached a duty owed to these plaintiffs. Accordingly, the finding of liability on the part of O'Donnell, Chantrey, Kennedy, and Territo is affirmed (with the exception of liability of Chantrey with respect to Badeaux), and the finding of liability on the part of Kelmell and Roberts is reversed.

SUMMARY
Regarding the Common Issues, the trial court did not err in cumulating and consolidating cases in forming the 129-plaintiff trial group. Appellants have failed to show concrete examples that the cumulation prejudiced them. The jury's rendering individualized verdicts, exonerating some defendants regarding some plaintiffs, shows that they were able to consider the evidence on an individualized basis.
The trial court issued no partial final judgments in this case. This assignment of error has no merit.
Plaintiffs' causes of action accrued prior to October 1, 1976, and thus they are allowed to sue Avondale Executive Officers in tort under pre-1976 LSA-R.S. 23:1032, if they can show significant exposures to asbestos at Avondale prior to that date, combined with the later manifestation of an injury, as per Cole v. Celotex, 599 So.2d 1058 (La.1992) and Walls v. American Optical, supra. We find that all plaintiffs in this group bore their burden of proof in this regard.
For the time period covering this lawsuit (exposures to asbestos prior to 1976), the LHWCA and state workers' compensation schemes were available to plaintiffs as concurrent remedies. The plaintiffs have elected to proceed under state law, and thus the LHWCA cannot and does not operate to bar their tort suits against Avondale Executive Officers.
The trial court did not limit the defendants' access to evidence and the use of expert witnesses regarding medical issues, contrary to their assertions. Case Management Order No. 1, dated September 21, 1992, allowed the defendants one independent medical examination of each plaintiff, and allowed them to petition the court for additional IMEs under certain conditions. This limitation was acceptable and reasonable in a litigation of this size and complexity. There is no evidence that such petitions were made and denied.
Common Issue Six was abandoned as not being specifically briefed. URCA-Rule 2-12.4.
The court did not err in its allocation of peremptory challenges. Neither did the trial court err in its allocation of time for opening and closing arguments. The record shows that, in fact, each party was able to present its position in the time allotted.
There is no evidence that the appellants were forced to present a joint defense in a compressed time frame. The fact that the jury exonerated some defendants as to some plaintiffs shows that the defendants were not prejudiced in the presentation of their cases.
The trial court did not err in prohibiting testimony and evidence regarding the contingency fee contract between attorney David Nutt and PAS, Inc. for the reasons expressed above in this opinion. Nor did the trial court err in prohibiting the testimony of William Tucker and Walter Floyd, who were not parties to this suit, and whose examinations were performed by doctors not called as witnesses in this suit. *119 The trial court did not err in allowing plaintiffs' expert witness reports admitted into evidence and used by the jury during deliberations. The reports were admitted under a hearsay exception, and as properly admitted evidence, were available to the jury during their deliberations.
The trial court did not allow plaintiffs' counsel to testify. Counsels' complained-of conduct occurred during the cross examination and fell within the wide latitude permitted within the scope of cross examination.
The trial court erred in allowing the introduction of certain post-1976 evidence during the testimony of Danny Joyce. The evidence of Avondale OSHA citations in the 1990s was irrelevant and prejudicial to the defendants, besides being hearsay. However, Joyce was afforded ample opportunity to rebut this evidence on redirect examination, rendering the error harmless. Likewise, the trial court did not err in excluding the proffered evidence, as Mr. Joyce's redirect examination was satisfactorily rehabilitative.
The jury was properly instructed on the products liability theory of "unreasonably dangerous per se," as this substantive law was in effect at the time these suits concern, pre-1976, as per Halphen v. Johns-Manville Sales Corp., supra. The evidence at trial did not warrant ACL's jury instruction regarding the defenses of sophisticated user and sophisticated purchaser.
The trial court's Canter charge on executive officer liability adequately reflected the law applicable to this case, and thus it was not error. In addition, the trial court's failure to charge the jury with the Avondale Interests' proposed charge regarding compliance with statutory regulations was not error. The charge the court actually gave adequately instructed the jury about the law on that issue.
We find that the jury verdict forms were not misleading. The verdict forms are not inconsistent with the products liability law in effect for this suit (pre-LPLA).
The trial court erred in failing to count Johns-Manville as a virile share for those plaintiffs to whom the jury found it liable. Counting Johns-Manville as a virile share does not offend the Johns-Manville Settlement Trust's provisions for pro rata states, which Louisiana is under its pre-comparative fault law applicable to this case.
While we find the trial court's discovery sanction against ACL excessive, we decline to find it reversible error because ACL was afforded a remedy, the proffer of the disputed evidence as directed by this court in Writ Application No. 95-C-722, and ACL did not avail itself of this remedy. The sanction, the presumption of exposure to ACL's asbestos fiber, relieved the plaintiffs of the burden of proving that ACL supplied the asbestos that was incorporated into products used at Avondale. Since ACL did not avail itself of the opportunity to proffer the disputed evidence, we decline to disturb the discovery sanction and the evidentiary consequences that followed. We find the record contains sufficient evidence to find ACL committed fraud, through its participation in QAMA.
To determine causation in asbestos cases, this court finds a plaintiff must show, by a preponderance of the evidence, that he was exposed to asbestos from defendants' products and that he received an injury that was substantially caused by that exposure, following Quick v. Murphy Oil, 93-2267 (La.App. 4th Cir.9/20/94), 643 So.2d 1291. We find no justification under the facts of this case for the departure from accepted traditional tort principles applicable in cases where there are multiple defendants.
*120 Considering the JNOVs as to the settling parties' virile shares and the plaintiffs' damage awards, we find that the trial court was correct in granting JNOV in favor of Anchor Packing, Armstrong World Industries, Flexitallic, Garlock, and Uniroyal, because the evidence was insufficient to establish that these manufacturers' products were a substantial cause of any plaintiffs injuries. We reserve consideration of the JNOV in favor of Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool Manufacturing, however, to a plaintiff specific analysis, because though the record contains sufficient evidence that these manufacturers' products substantially contributed to the asbestos dust in the working environment at Avondale, not every plaintiffs work history reflects exposure to each of these products.
We reverse the JNOVs that raised the plaintiffs' damage awards, and reinstate the jury's damage awards. The jury heard conflicting expert medical testimony on each plaintiff that differed widely in diagnoses, from asbestosis to no asbestos effects for the same plaintiff. The jury's damage awards reflect a reasonable interpretation of the widely divergent evidence they heard, and the trial court erred in overturning them on JNOV.
We find the evidence amply proved that Avondale Executive Officers James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo had or had been properly delegated the personal, legal duty to provide a safe workplace for the plaintiffs, and breached that duty. We therefore affirm that part of the trial court's judgment. The evidence was lacking, however, regarding George Kelmell and J.D. Roberts, and we must reverse the jury's finding them liable to each plaintiff. This court will consider the liability of O'Donnell, Kennedy, Chantrey, and Territo per each plaintiff. In this group, we find that the evidence supports the jury's finding each of these four Executive Officers liable to each plaintiff in this group, with the exception of Lester Badeaux, who left Avondale prior to Chantrey's assumption of his duties. Accordingly, Badeaux's verdict against Chantrey is reversed.

EXPLANATION OF VIRILE SHARE CALCULATIONS
Since we have changed the number of defendants cast in judgment and have reversed the grant of JNOVs in favor of some settling defendants, we are required to make adjustments in the virile share calculations of each plaintiffs judgment, and render amended judgments. Below is an explanation of how we arrived at the amended judgments set forth in our decree. We do not include in the judgment decrees those defendants who settled after trial (Westinghouse, Owens Corning, Pittsburgh Corning, National Gypsum, GAF Corp./Ruberoid, and A.P. Green Industries).
Alfred AdamsThe amount of the amended judgment set forth in our decree ($3,197.35) represents five virile shares at $639.47 per share. This amount was determined by the following calculation. The jury found 10 defendants liable: Westinghouse, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found sixteen (16) settled manufacturers liable: Anchor Packing, A.P. Green Industries, Armstrong World Industries, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Flexitallic, GAF Corporation/Ruberoid, Garlock, Johns Manville, National Gypsum Corporation, Owens Illinois, Rapid American, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO); for a total of 26 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers *121 whose liability was reversed on appeal by this court), and five shares for the JNOVs that we affirm in favor of Anchor Packing, Armstrong, Flexitallic, Garlock, and Uniroyal, leaving a total of 19 virile shares. The jury's damage award of $12,150.00 divided by 19 equals $639.47 per virile share.
Lester BadeauxThe amount of the amended judgment set forth in our decree ($1,500.00) represents four virile shares at $375.00 per share. This amount was determined by the following calculation. The jury found thirteen (13) defendants liable: Westinghouse, GAF Corporation/Ruberoid, National Gypsum Corporation, A.P. Green Industries, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found nine (9) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Garlock, Johns-Manville, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO); for a total of 22 virile shares. We subtract three shares for George Kelmell, J.D. Roberts, and John Chantrey (Avondale Executive Officers whose liability was reversed on appeal by this court), and three shares for the JNOVs that we affirm in favor of Anchor, Garlock, and Uniroyal, leaving a total of 16 virile shares. The jury's damage award of $6,000.00 divided by 16 equals $375.00 per virile share.
Leroy BonamourThe amount of the amended judgment set forth in our decree ($3,368.40) represents five virile shares at $673.68 per share. This amount was determined by the following calculation. The jury found thirteen (13) defendants liable: Westinghouse, GAF Corporation/Ruberoid, National Gypsum Corporation, A.P. Green Industries, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found eleven (11) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Garlock, Johns-Manville, Owens-Illinois, Rapid American, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO); for a total of 24 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers whose liability was reversed on appeal by this court), and three shares for the JNOVs that we affirm in favor of Anchor Packing, Garlock, and Uniroyal, leaving a total of 19 virile shares. The jury's damage award of $12,800.00 divided by 19 equals $673.68 per virile share.
William E. BoudreauxThe amount of the amended judgment set forth in our decree ($2,000.00) represents five virile shares at $400.00 per share. This amount was determined by the following calculation. The jury found thirteen (13) defendants liable: Westinghouse, GAF Corporation/Ruberoid, National Gypsum Corporation, A.P. Green Industries, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found eight (8) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Garlock, Johns-Manville, Rock Wool Manufacturing, and UNR (UNARCO); for a total of 21 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers whose liability was reversed on appeal by this court), and two shares for the JNOVs that we affirm in favor of Anchor Packing and Garlock, leaving a total of 17 virile shares. The jury's damage award of $6,800.00 divided by 17 equals $400.00 per virile share.
Oscar ChampagneThe amount of the amended judgment set forth in our decree ($4,941.20) represents five virile shares at $988.24 per share. This amount was determined *122 by the following calculation. The jury found thirteen (13) defendants liable: Westinghouse, GAF Corporation/Ruberoid, National Gypsum Corporation, A.P. Green Industries, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found nine (9) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Garlock, Johns Manville, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO); for a total of 22 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers whose liability was reversed on appeal by this court), and three shares for the JNOVs that we affirm in favor of Anchor Packing, Garlock, and Uniroyal, leaving a total of 17 virile shares. The jury's damage award of $16,800.00 divided by 17 equals $988.24 per virile share.
Roger H. QuaveThe amount of the amended judgment set forth in our decree ($3,368.40) represents five virile shares at $673.68 per share. This amount was determined by the following calculation. The jury found thirteen (13) defendants liable: Westinghouse, GAF Corporation/Ruberoid, National Gypsum Corporation, A.P. Green Industries, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found eleven (11) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Garlock, Johns Manville, Owens Illinois, Rapid American, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO); for a total of 24 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers whose liability was reversed on appeal by this court), and three shares for the JNOVs that we affirm in favor of Anchor Packing, Garlock, and Uniroyal, leaving a total of 19 virile shares. The jury's damage award of $12,800.00 divided by 19 equals $673.68 per virile share.
Alvin RobinThe amount of the amended judgment set forth in our decree ($20,131.60) represents five virile shares at $4,026.32 per share. This amount was determined by the following calculation. The jury found thirteen (13) defendants liable: Westinghouse, GAF Corporation/Ruberoid, National Gypsum Corporation, A.P. Green Industries, Pittsburgh Corning, Owens Corning, Asbestos Corporation Limited, and the six Avondale Executive Officers; and found eleven (11) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corporation, Garlock, Johns-Manville, Owens-Illinois, Rapid American, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO); for a total of 24 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers whose liability was reversed on appeal by this court), and three shares for the JNOVs that we affirm in favor of Anchor Packing, Garlock, and Uniroyal, leaving a total of 19 virile shares. The jury's damage award of $76,500.00 divided by 19 equals $4,026.32 per virile share.

DECREE:

ALFRED ADAMS
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We REVERSE the JNOV as to quantum and reinstate the jury's damage award of $12,150.00; we REVERSE the finding of liability as to George Kelmell and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns-Manville, Rapid American, and Rock Wool Manufacturing from the virile share calculation; in all other respects we AFFIRM the judgment of the trial court.
*123 Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Alfred Adams and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo in the amount of $3,197.35, including legal interest from date of judicial demand and all costs, including costs of appeal.

LESTER BADEAUX
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We REVERSE the JNOV as to quantum and reinstate the jury's damage award of $6,000.00; we REVERSE the finding of liability as to George Kelmell, J.D. Roberts, and John Chantrey; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns-Manville, and Rock Wool Manufacturing from the virile share calculation; in all other respects we AFFIRM the judgment of the trial court.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Lester Badeaux and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, and Peter Territo in the amount of $1,500.00, including legal interest from date of judicial demand and all costs, including costs of appeal.

LEROY BONAMOUR
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We REVERSE the JNOV as to quantum and reinstate the jury's damage award of $12,800.00; we REVERSE the finding of liability as to George Kelmell and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns Manville, Rapid American, and Rock Wool Manufacturing from the virile share calculation; in all other respects we AFFIRM the judgment of the trial court.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo in the amount of $3,368.40, including legal interest from date of judicial demand and all costs, including costs of appeal.

WILLIAM E. BOUDREAUX
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We REVERSE the JNOV as to quantum and reinstate the jury's damage award of $6,800.00; we REVERSE the finding of liability as to George Kelmell and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns-Manville, and Rock Wool Manufacturing from the virile share calculation; in all other respects we AFFIRM the judgment of the trial court.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of William E. Boudreaux and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo in the amount of $2,000.00, including legal interest from date of judicial demand and all costs, including costs of appeal.

OSCAR CHAMPAGNE
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We REVERSE the JNOV as to quantum and reinstate the jury's damage award of $16,800.00; we REVERSE the finding of liability as to George Kelmell and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns-Manville, *124 and Rock Wool Manufacturing from the virile share calculation; in all other respects we affirm the judgment of the trial court.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Oscar Champagne and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo in the amount of $4,941.20, including legal interest from date of judicial demand and all costs, including costs of appeal.

ROGER H. QUAVE
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We REVERSE the JNOV as to quantum and reinstate the jury's damage award of $12,800.00; we REVERSE the finding of liability as to George Kelmell and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns-Manville, Rapid American, and Rock Wool Manufacturing from the virile share calculation; in all other respects we affirm the judgment of the trial court.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Roger H. Quave and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo in the amount of $3,368.40, including legal interest from date of judicial demand and all costs, including costs of appeal.

ALVIN ROBIN
The trial court's judgment of December 9, 1996 is REVERSED IN PART AND AFFIRMED IN PART. We AFFIRM the jury's damage award of $76,500.00; we REVERSE the finding of liability as to George Kelmell and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns-Manville, Rapid American, and Rock Wool Manufacturing from the virile share calculation; in all other respects we affirm the judgment of the trial court.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Alvin Robin and against Asbestos Corporation Limited, James O'Donnell, Steven Kennedy, John Chantrey, and Peter Territo in the amount of $20,131.60, including legal interest from date of judicial demand and all costs, including costs of appeal.
REVERSED IN PART; AFFIRMED IN PART.

DENIAL OF REHEARING REQUESTS
The Applications for Rehearing from this Court's Per Curiam Opinion dated March 28, 2001, filed by appellants, Asbestos Corporation Limited, Avondale Executive Officers and their insurers, and Plaintiffs/Appellees are hereby denied.
Regarding costs of Court. Plaintiffs, Owens-Corning and Champion International entered a Joint Stipulation, "that each party would bear its own costs" and "all appeals of the December 9, 1996 Judgment with respect to the ruling granting Plaintiff's and Champion International's Motion to Tax Costs and denying Owens-Corning's Motion to Tax Costs may be dismissed as moot." As set forth in the Joint Proposal of Defendants/Appellants for Organization of Appellate Briefs, appeals on costs were filed because the trial court improperly assessed costs against all defendants cast in judgment for all cases whether or not a particular defendant was a party in a particular consolidated suit. Asbestos Corporation and Avondale Executive Officers were not parties to *125 the stipulation and we find that the stipulation does not affect the trial court's award of court costs against them when they were named defendants cast in judgment in particular suits.
This Court considers the Per Curiam Opinion as precedent for all consolidated cases. Rulings on all common issues are considered final and will not be readdressed in other consolidated cases.
NOTES
[1] Patrick Clark was one of two plaintiffs with cancer.
[2] Because each defendant initially filed a cross claim against each other and because this is a pre-comparative fault case, the amount actually owed by each viable defendant is reduced by the number of virile shares of those defendants who settled and have been found to be joint and solidary obligors with the remaining defendants.
[3] While referred to as Executive Officers, these six Avondale employees held various jobs during their tenure, some of which may not be a true "executive officer" in the corporate sense. However, the jurisprudence deciding co-employee liability has used the term "executive officer" in describing the co-employee. We, therefore, use that term throughout this opinion in reference to these six defendants.
[4] The Executive Officers were named in only 84 of the 129 lawsuits. The executive officer defendants were found to be liable to 72 plaintiffs. Plaintiffs and the Avondale Executive Officers stipulated that all of the Avondale defendant-employees were insured by American Motorists Insurance Company, Commercial Union Insurance Company, Highlands Insurance Company, and Travelers Insurance Company. Thus, although James O'Donnell, George Kelmell, and John Chantrey are deceased, and there has been no substitution of parties defendant, wherever we refer to the liability of an individual officer that reference means the respective insurer.
[5] One brief addressing the common issues was filed on behalf of all appellees except Earlven Gauthe and Johnnie Johnson. Mr. Gauthe and Mr. Johnson filed a separate brief.
[6] The writ plaintiffs refer to was filed by the defendant Todd Shipyard in another proceeding. See Abadie v. Metropolitan Life Ins. Co., 95-C-181 (La.App. 5th Cir.4/12/95).
[7] At the time of trial, article 1561 read:

When two or more separate suits involving a common issue of law or fact are pending in the same court, the court, at any time prior to trial, may order the consolidation of the suits for trial or may order a joint trial of any of the common issues.
The article was amended in 1997, and the amendment merely codified the jurisprudence holding that consolidation should not be ordered if it would result in confusion of the jury, prevent a fair trial, or prejudice any party.
[8] Acts 1979, no. 431, effective on August 1, 1980.
[9] However "herculean" the task of determining the date of contraction of asbestos-related diseases, the jury managed it in Cole, as the Third Circuit noted and explicitly affirmed. Likewise, so did the court in Schouest v. Stipelcovich, 490 So.2d 294 (La.App. 5th Cir. 1986).
[10] This issue is not mentioned in Avondale Interests' brief.
[11] LSA C.E. art. 607(B).
[12] See LSA C.E. arts. 403 and 607.
[13] According to Uniform Rules of Louisiana Courts of Appeal, Rule 2-12.4:

The argument on a specification or assignment of error in a brief shall include a suitable reference by volume and page to the place in the record which contains the basis for the alleged error. The court may disregard the argument on that error in the event suitable reference to the record is not made.
[14] Mr. Joyce was a former employee of Avondale, having served as an industrial hygienist from 1980 to 1984 and as safety director from 1984 to 1991, when he left to form an industrial hygiene consulting business.
[15] The Executive Officers took two Writ Applications to this court regarding these issues, 96-C-134 and 96-C-138. This court denied both writs.
[16] Construction Materials, Inc. v. American Fidelity Fire Ins. Co., 388 So.2d 365, 367 (La.1980), citing Norton v. Crescent City Ice Mfg. Co., 178 La. 135, 145, 150 So. 855, 858 (La.1933).
[17] Succession of Clivens, 426 So.2d 585, 587 (La.1982).
[18] J-M did not directly participate in the trial. J-M had previously filed for bankruptcy protection, and the Johns-Manville Settlement Trust, established through the Bankruptcy Court, administered all claims against J-M. Most plaintiffs sued the Trust.
[19] The trust language referred to in this opinion comes from In re Joint Eastern and Southern Districts Asbestos Litigation, 878 F.Supp. 473, 591-592 (E.D.N.Y.1995), specifically Section 3, Calculation of set-off.
[20] At the time the jury verdicts were rendered, only two plaintiffs, Earlven Gauthe and Patrick Clark, who had mesothelioma, had received any money from the Johns-Manville Settlement Trust ($20,000). At that time, no other plaintiffs had applied to the trust, although in the Common Issue briefs it is alleged that the other plaintiffs have now applied to the settlement, though none but Gauthe and Clark had received any money.
[21] In re Joint Eastern and Southern Districts Asbestos Litigation, 878 F.Supp. 473 (E.D.N.Y.1995) details the Trust's establishment in 1988 and its difficulties in funding distributions to the massive amount of claimants.
[22] The title of this section and the following quote is taken directly from an article by Craig A. Etter, "The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?" 15 Ind.L.Rev. 679, n. 5 (1982).
[23] The term "exposure" in asbestos cases means the inhalation of asbestos fibers in the lungs. Asbestos v. Bordelon, supra, at 26, 726 So.2d at 948.
[24] The plaintiffs entered into settlements with the following parties, according to the transcript: Fibreboard, Garlock, Rock Wool, UNR Industries, Rapid American, Combustion Engineering, Babcock & Wilcox, Owens-Illinois, and Uniroyal. The underlined parties plus Anchor Packing, Armstrong World Industries, and Flexitallic were granted JNOVs and removed from the virile share calculation. Various plaintiffs also entered into settlements with OCF, Pittsburgh-Corning, A.P. Green Industries, Asbestos Claims Management, and GAF Corporation, according to a Settlement Stipulation filed in this court on June 8, 2000.
[25] The trial court granted JNOVs in favor of nine, not six, settling defendants and/or nonparties. In a case of conflict, the judgment, and not the reasons for judgment, controls. McCalmont v. Jefferson Parish Sheriff's Office, 99-940 (La.App. 5th Cir.1/12/00), 748 So.2d 1286.
[26] The trial court must calculate virile shares because the plaintiffs' cases are governed by pre-comparative fault law, as per Cole v. Celotex, 599 So.2d 1058 (La.1992).
[27] From the trial court's Reasons for Judgment (JNOV), December 6, 1996.
[28] This court notes the extensive evidence offered about Garlock and Flexitallic gaskets in Asbestos v. Bordelon, Inc., 96-0525 (La.App. 4th Cir.10/21/98), 726 So.2d 926, despite which the trial court found insufficient evidence that these products caused a significant exposure to asbestos dust, and granted these parties a directed verdict.
[29] Armstrong, Flexitallic, Garlock, and Uniroyal.
[30] Affirmed in part and reversed in part on other grounds, State, Dept. of Transp. & Development v. Scramuzza 96-1796 (La.4/8/97), 692 So.2d 1024.
[31] JURY VERDICT RESEARCH SERIES, LRP Pub. No. 4.90.2, BASIC INJURY FOR RESPIRATORY TRACT INJURIES at 8 (2000).
[32] R-3132-ICJ Inst. Civ. Justice 1984, VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES, James S. Kaklik, et al.
[33] Christopher F. Edley & Paul C. Weilder, Asbestos: A Multi-Billion-Dollar Crisis, 30 Harv. J. on Legis. 383, 395 (1993).
[34] Lester Brickman, Proceedings of the Administrative Conference of the United States, October 31, 1991 Colloquy: An Administrative Alternative to Tort Litigation to Resolve Asbestos Claims-The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?, 13 Cardozo L.Rev. 1819, 1857 (1992).
[35] Anchor Packing, Armstrong World Industries, Babcock & Wilcox, Combustion Engineering, Flexitallic, Garlock, Rapid American (Philip Carey prior to December 1966), Rock Wool Manufacturing Co., and Uniroyal, Inc./United States Rubber Co.
[36] Our discussion is limited to the law applicable prior to October 1, 1976 when the Louisiana Worker's Compensation law was amended to specifically prohibit negligence suits against Executive Officers for work-related injuries. Thus, our inquiry is limited to the actions of the Executive Officers prior to that date.
[37] 385 So.2d 1176 (La.1979).
[38] 408 So.2d 1344 (La.1982).
[39] 430 So.2d 16 (La.1982).
[40] In 1976, the PEL was lowered to 2 fibers per cubic centimeter of air.
[41] The evidence indicates that Lester Badeaux stopped working at Avondale in January 1972 and Roberts did not start working in the safety department until February 1972.